STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ULIOUS LEE GREEN AND JESSE GREEN, DEFENDANTS-APPELLANTS.

Argued December 5, 1972—Supplemental Material Filed December 21, 1972—Decided April 9, 1973.

548

*Mr. David P. Jacobs,* Assistant Deputy Public Defender, argued the cause for appellants (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Bruce P. Miller,* Special Assistant Prosecutor, argued the cause for respondent (*Mr. Michael H. Stieber,* Assistant Prosecutor, of counsel and on the brief; *Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

The opinion of the Court was delivered by

LEWIS, P. J. A. D., Temporarily Assigned. Defendants Ulious Green and Jesse Green are brothers. After a joint trial before a jury, Ulious was found guilty of assault and battery on a police officer (*N. J. S. A.* 2A:90–4), carrying a dangerous knife (*N. J. S. A.* 2A:151–41(c)) and threatening life (*N. J. S. A.* 2A:113–8). He was sentenced to

State Prison for a term of three to five years for each offense, all terms to run concurrently. Jesse was found guilty of the first two charges and not guilty of the third. He was sentenced to the Youth Reception and Correction Center, Yardville, for two concurrent indeterminate terms.

On appeal to the Appellate Division the judgments of convictions and the sentences were affirmed. 116 *N. J. Super.* 515 (App. Div. 1971). This Court granted defendants' petition for certification. 60 *N. J.* 22 (1972).

It is here urged, as contended in substance before the Appellate Division, that: (1) defendant Ulious Green's sentence was illegal in that the sentencing judge considered arrests not followed by convictions in determining the sentences; (2) the convictions of the respective defendants for possession of a dangerous knife were the result of error; (3) the trial court's charge on threatening to kill was plainly erroneous, and (4) defendant Jesse Green was unlawfully convicted of assault and battery because the verdict was not unanimous, and all other verdicts are tainted.

Points 3 and 4 present no valid basis for a reversal and as to those issues we affirm for the reason stated by the Appellate Division (116 *N. J. Super.* at 523–524). In that court's opinion, the pertinent evidence before the trial court is succinctly summarized and need not be repeated for purposes of this opinion except to the extent relevant and necessary to our review of the remaining issues.

## A DANGEROUS KNIFE

It appears from the record that on June 6, 1969 two security guards at a department store in Newark observed defendants in the act of shoplifting and then leaving the store. The guards immediately flagged down three detectives in an unmarked police car who together with the guards pursued defendants and within a short time overtook them. After a command to "stop" defendants fled in opposite directions but were promptly followed and apprehended. At police

headquarters a search revealed that each defendant had a knife in his pocket. The knives were admitted in evidence and submitted to the jury for inspection, but they were not produced before this Court and they are not fully described in the record. At oral argument, however, defense counsel stated that the knives were of the pocket type with a single folding blade approximately 3½ inches long which would not lock when opened.

Each defendant urges that his conviction for possession of a "dangerous knife" in violation of *N. J. S. A.* 2A:151–41(c) should be reversed because his knife had a folding, non-locking blade and as a matter of law was not such a forbidden instrument, that the trial judge committed plain error in his charge by failing to give the jury an adequate standard for determining what is a "dangerous knife," and that he also erred in excluding testimony of defendants that they carried the knives as tools necessary for their employment.

The pertinent provisions of *N. J. S. A.* 2A:151–41 relating to carrying concealed weapons without a permit or identification card reads:

Except as hereinafter provided, any person who carries, holds or possesses in any automobile, carriage, motor cycle or other vehicle, or on or about his clothes or person, or otherwise in his possession, or in his possession or under his control in any public place or public area:

\* \* \* \* \* \* \* \*

c. Any dangerous instrument of the kinds known as a blackjack, slung shot, billy, sandclub, sandbag, bludgeon, metal knuckles, cestus or similar leather band studded with metal for fitting on the knuckles, loose wool impregnated with metal filings, or razor blades imbedded in wood slivers, dagger, dirk, *dangerous knife* or knife as defined in chapter 5 of the laws of 1952 (C.2A:151–62) [forbids possession of a knife with a blade which opens automatically by hand pressure — sometimes referred to as a "switchblade" knife], stiletto, grenade, bomb or other explosive, other than fixed ammunition, except as such person may be licensed to carry, hold or possess explosives under the provisions of Title 21 of the Revised Statutes and amendments thereto, *is guilty of a high misdemeanor.* [*L.* 1968, c. 307, §1; emphasis supplied]

The source of this statute reverts to *L.* 1905, *c.* 172, § 1, which made it a misdemeanor for one to carry certain stated firearms or "any stiletto, dagger or razor or any knife with a blade five inches in length or over concealed in or about his clothes or person * * *." The act also contained an omnibus clause covering any "other deadly, offensive or dangerous weapon or firearm."

The carrying concealed weapons section of *L.* 1922, *c.* 138, § 1, the precursor of *N. J. S. A.* 2A:151–41(c), made significant modifications. The designation "dangerous knife" replaced the phrase "knife with a blade five inches in length or over," the term "razor" was omitted and the list of specific weapons was preceded by the language "* * * of the kind known as * * *" which was substituted for the omnibus clause. Subsequent amendments retained these changes but the list of specifically prohibited weapons has been widely expanded.[1]

 It is basic in the construction of legislation that every effort should be made to harmonize the law relating to the same subject matter. Statutes *in pari materia* are to

---

[1]There are several pertinent amendments intervening the enactment of *L.* 1905, *c.* 172 and the adoption of the last amendment, *L.* 1968, *c.* 307. *L.* 1909, *c.* 17, § 1 added "bludgeon, blackjack, knuckles, sandbag, or slung-shot." *L.* 1922, *c.* 138, §1 added "billy," "sandclub" and changed "knuckles" to "metal knuckles" in addition to changes mentioned above in the text. *L.* 1924, *c.* 137, §1 added "bomb or other high explosive, other than fixed ammunition." The 1937 statutory revision incorporated the previous list of prohibited weapons into *R. S.* 2:176–41; the same list of weapons was carried forward in the 1951 statutory revision by *N. J. S.* 2A:151–41. *L.* 1960, *c.* 26, §1 amended the 1951 revision to include "cestus or similar leather band studded with metal for fitting on the knuckles, loose wool impregnated with metal filings, or razor blades imbedded in wood slivers." *L.* 1966, *c.* 60, §32 deleted the phrase "or other firearms" following the words "pistol, revolver" and specified rifles and shotguns as being prohibited weapons; also added to the list of prohibited weapons were knives as defined by *N. J. S. A.* 2A:151–62 (so-called switchblade knives) and grenades. *L.* 1968, *c.* 307, §1 made no new additions to the list of prohibited weapons but did increase the penal sanction from that of a misdemeanor offense to one of a high misdemeanor.

be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent. Such enactments are to be considered "as a homogeneous and consistent whole, giving effect to all their provisions." *Watson v. Jaffe,* 121 *N. J. Super.* 213, 214 (App. Div. 1972). See generally *McCaffrey, Statutory Construction,* § 44, at 83–91 (1953) ; 2 *Sutherland Statutory Construction* (3 ed. *Horack,* 1943), §§ 5201–5202, at 529–539.

Accordingly, reference is made to *N. J. S. A.* 2A:151–56 which relates to unlawful use or possession of weapons or explosives and incriminates any person who attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any instruments or weapons as enumerated in *N. J. S. A.* 2A:151–5, "or any other dangerous or deadly instrument or weapon." The crime under this section is a high misdemeanor punishable by a fine of not more than $5,000 or by imprisonment for not more than ten years, or both. The provisions of *N. J. S. A.* 2A:151–5 relate to additional sentences to be imposed upon armed criminals who commit or attempt to commit stated crimes when armed with or having in their possession "any firearm, * * * or dangerous instrument of any kind, usually known as a * * * dagger, dirk, dangerous knife * * * or any object or device, whether toy or imitation, having an appearance similar to or capable of being mistaken for any of the foregoing * * *." The category of weapons stated in this section is broader than the list specified in *N. J. S. A.* 2A:151–41(c). Additionally, under *N. J. S. A.* 2A:151–57 the possession of any weapon enumerated in *N. J. S. A.* 2A:151–56, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possession, "with intent to use the same in violation of that section."

It is thus clear that the Legislature by enacting section 41(c) intended to prohibit the naked possession of certain concealed weapons, an offense to be distinguished from similar crimes where in addition to possession there

are elements of use, attempted use or an intent to use such weapons. As to the latter crimes, the penalty is not only greater but there attaches to the fact of possession a presumption of intent to use the same in violation of the law. Section 41(c) in proscribing possession of a "dangerous knife" does not define those words but it is significant that the generic term "knife" is qualified by the word "dangerous."[2]

In *State v. Horton,* 98 *N. J. Super.* 258 (App. Div. 1967), certif. den. 51 *N. J.* 393 (1968), defendant's jury conviction under *N. J. S. A.* 2A:151-41(c) for possession of a dangerous knife was affirmed. The knife was of the folding type with a 4½ inch blade which was narrowed by honing to a sharp point. There was evidence that defendant was observed shoplifting and when he was detained he shoved a police officer to the ground and fled. Upon subsequent apprehension a struggle with the police followed during which time defendant attempted to reach into his right back pocket and, upon being subdued and searched, the knife was found in that pocket. The Appellate Division rejected defendant's argument that the statute under which he was convicted suffered the constitutional infirmity of vagueness and found that the act itself provides sufficient guidelines "by the categorization contained in it." 98 *N. J. Super.* at 261. It was also noted that the jurors had the knife before them and that the trial judge read to the jury the pertinent sections of the statute. In dealing with the term "dangerous knife," the reviewing court concluded that by those words, when read in the context of the statute, "it is readily seen that what the Legislature contemplated was a knife dangerous to life

---

[2]See the final report of the Criminal Law Revision Commission, which proposes to retain the term "dangerous knife" but to limit the crime to possession "with a purpose to use the same unlawfully against another * * *." *New Jersey Penal Code,* vol. 1, § 2C:39-3(i), at 137. The comments to the Code suggest that the proposal "* * * changes existing law in requiring a purpose as to possession of knives which are not, in themselves, indicative of criminal purpose." *Id.,* vol. II, § 2C:39-3(9), at 309.

or human safety; one by the use of which a fatal wound may probably or possibly be given." *Id.*

In a later case, which was tried without a jury on stipulated facts, the Law Division held that a folding pocket-knife with a blade measuring 3½ inches, found closed in defendant's pocket was not a "dangerous knife" in violation of the statute. No reason for the search was advanced and defendant was acquitted. *State v. Edwards,* 120 *N. J. Super.* 46 (Law Div. 1972). See also *People v. Vaines,* 310 *Mich.* 500, 17 *N. W.* 2d 729 (Sup. Ct. 1945), where an ordinary jackknife with a pointed blade 3-5/16 inches long was found not to be a "dangerous weapon *per se*" nor a "dangerous weapon" within the concealed weapons statute in the absence of evidence that it was used or carried for use as a weapon. Compare *People v. Morris,* 8 *Mich. App.* 688, 155 *N. W.* 2d 270 (Ct. App. 1967) (circumstances indicated defendant intended to use a concealed straight razor).

There are a number of reported decisions relating to dangerous weapons emanating from the courts of the District of Columbia and some of them are sufficiently analogous to merit mention. Under the District's Code, Title 22, Section 3204, a person is prohibited from carrying in public either openly or concealed on or about his person "a pistol, * * * or any deadly or dangerous weapon capable of being so concealed." A much cited case interpreting that provision is *Degree v. United States,* 144 *A.* 2d 547 (D. C. Mun. Ct. App. 1958), wherein it was held that all knives are not to be considered " 'deadly or dangerous weapons' as a matter of law and under all conditions." In *Scott v. United States,* 243 *A.* 2d 54 (D. C. Ct. App. 1968), there was evidence that appellant and a companion, one Jessie Smith, were known to the arresting officer who observed their activities at a movie theater. When they were requested by the officer to step into the lobby for questioning with respect to a narcotics investigation, Smith was seen dropping a knife he had been carrying into a nearby cigarette ash container, which knife was retrieved by the officer. At the same instant he noticed ap-

pellant attempting to conceal a yellow-handled knife (ten inches long when extended) up the sleeve of his coat. The officer immediately placed the men under arrest. The trial judge was unable to conceive any legitimate reason for carrying such a large knife in a theater and appellant refused to offer any explanation. The Appellate Court adopted the test "[whether] the purpose of carrying the object, under the circumstances, is its use as a weapon," 243 *A.* 2d at 56, and declared it was convinced that there was sufficient evidence to support the trial court's finding that the knife was a deadly weapon. The same test was applied in *Leftwitch v. United States,* 251 *A.* 2d 646 (D. C. Ct. App. 1968), which involved a furtive attempt to dispose of a butcher knife that defendant was carrying, and in *Clarke v. United States,* 256 *A.* 2d 782 (D. C. Ct. App. 1969), where a search of a defendant incident to a lawful arrest resulted in the seizure of a straight razor. See also *Gilmore v. United States,* 271 *A.* 2d 783 (D. C. Ct. App. 1970), for its holding that the evidence supported a conviction for carrying a dangerous weapon where defendant had on his person, at 3 A.M. in a bus terminal, a folding knife which had been pegged so that the knife could be more quickly opened for use.

Defendants here urge that the legislative scope of section 41(c) limits the instruments proscribed to those which by their design are primarily intended to be used as weapons, citing *People v. Cricuoli,* 157 *App. Div.* 201, 141 *N. Y. S.* 855 (App. Div. 1913). Such a construction would be too narrow. See generally 56 *Am. Jur., Weapons and Firearms,* § 2, at 991, and in particular the comment: "The character of a weapon as a deadly or dangerous one is not, however, necessarily determined by its design, construction or purpose; a weapon may be deadly or dangerous although not especially designed or constructed for offensive or defensive purposes or for the destruction of life or the infliction of bodily injury." As stated in *Scott v. United States, supra,* in referring to a folding knife, such an instrument may be dangerous in its original use as contemplated by its design

and construction "or where the purpose of carrying the object, under the circumstances, is its use as a weapon." 243 *A*. 2d at 56.

It is also claimed that within the ambit of section 41(c) defendants were not in possession of a "dangerous knife" because that term, as included in the enumeration of proscribed instruments, is preceded by the words "dagger" and "dirk" and is followed by the language "knife as defined in chapter 5 of the Laws of 1952" (statute dealing with so-called switchblade knives), all of which are weapons *per se.* Thus the argument runs that under the doctrine of *noscitur a sociis* a "dangerous knife" must have similar characteristics and must likewise be dangerous *per se,* and therefore the term "dangerous knife" embraces only knives with fixed or locked blades to the exclusion of folding-blade knives. We are cited to *People v. Forrest,* 67 *Cal.* 2d 478, 62 *Cal. Rptr.* 766, 432 *P.* 2d 374 (Sup. Ct. 1967) (*en banc*), and note therein the court's observation:

> Although the large blade in the knife involved here is pointed and to a minor extent tapered, the knife folds like a pocketknife, and the blade of the knife when opened does not lock in place. This severely limits its effectiveness as a stabbing weapon, because if the blade should hit a hard substance such as a bone, there is grave danger that the blade would close upon the hand of the wielder. This distinguishes it from a dirk or dagger. It was not designed primarily for stabbing. Therefore, as a matter of law, it is not a dirk or dagger as these terms are used in the statute. [62 Cal. Rptr. at 768, 432 *P.* 2d at 376]

The issue in that case was whether an oversized penknife was a "dagger or dirk" and since the knife blade did not lock in place it was determined that the knife was not such a weapon. Defendants can take no solace from either the facts or the law of that case. Compare *People v. Bain,* 5 *Cal.* 3d 839, 97 *Cal. Rptr.* 684, 489 *P.* 2d 564 (Sup. Ct. 1971) (*en banc*), where the same court held that it was a jury question whether a folding knife with a five-inch *locking* blade was a "dirk or dagger."

The subject matter of *N. J. S. A.* 2A:151–41(c) logically and reasonably demonstrates a legislative intent to forbid the possession of a larger category of dangerous instruments than those characterized by defendants as dangerous *per se*.

██ Plainly the possession of any knife is not an incriminatory offense and a knife, popularly known as a pocketknife, penknife, or jackknife, commonly carried for personal utility, convenience or other lawful purpose is not a "dangerous knife" *per se*. That is not to say, however, that such a knife, irrespective of the length of its blade or the circumstances under which it is carried, may not be a lethal weapon and should be excluded as a matter of law from the term "dangerous knife" the possession of which is interdicted by statute. Distilled from the rationale of our relevant statutes and the prevailing decisional law is a reasonable conclusion that a knife which is not dangerous *per se* will be a "dangerous knife" if the purpose of possession is its use as a weapon.

This brings us to the issue of whether the trial judge committed plain error in his charge to the jury. The jury was told that the words "dangerous knife" as employed in the statute mean exactly what they say and that it should decide under all the facts and circumstances whether the State had proved beyond a reasonable doubt that defendants possessed on the day named in the indictment "a dangerous knife."

██ To define a dangerous knife as a knife that is dangerous is meaningless tautology. We interpret section 41(c) to outlaw the carrying of an otherwise useful pocketknife or the like when the surrounding circumstances — such as the size, shape and condition of the knife, the nature of its concealment, the time, place and actions of the carrier when found in his possession — indicate that the purpose of carrying the instrument is its use as a weapon. The trial judge should have elaborated more fully on the meaning of "dangerous knife" by giving guidelines or standards to the jury for reaching a proper conclusion.

██ Another element of error in the case is the trial court's ruling on the admissibility of evidence which effectively precluded defendants from giving an explanation as to why each was carrying a pocketknife. In determining whether such possession was prohibited by the statute, the jurors were entitled to consider all the circumstances surrounding "possession and use." See *Leftwitch v. United States, supra,* 251 *A.* 2d at 649. The jurors would not be obliged to believe defendants' explanations but they were at least entitled to hear them.

██ The net result of these errors had a clear capacity for producing an unjust result. *R.* 2:10–2. The jury was left without appropriate instructions as to the nature of the crime charged under *N. J. S. A.* 2A:151–41(c), without knowing the functional test or meaning of a "dangerous knife" and without the benefit of defendants' testimonial explanation for carrying their respective pocketknives. The cumulative effect was not harmless but sufficiently prejudicial as to constitute a denial of a fair trial on the weapons charges against defendants. On that indictment defendants are entitled to a new trial.

We are convinced from our study of the record, however, that the foregoing errors did not in any way affect the fairness of the trial with respect to the remaining two indictments.

## THE PRESENTENCE REPORT

Ulious alleges that his sentences were illegal because at the sentencing hearing the trial court indicated that it would take into "consideration" two arrests included in his presentence report, one (aggravated assault and battery and possession of a gun in 1959) which showed a "not guilty" disposition and another (unlawful possession of a hypodermic needle in 1968) which had been "dismissed." The report listed 11 other charges that had been sustained (three juvenile, three larceny, two narcotic, two motor vehicle and one disorderly person) ranging in time span from 1950 to

1969. The sentencing transcript with respect to these arrests reveals this colloquy:

THE COURT: Why do you object to that?
MR. GRAVES [defense counsel]: Well, your Honor —
THE COURT: Are you saying they aren't facts?
MR. GRAVES: I am not saying they are not facts. I am simply saying they are not properly matters for consideration.
THE COURT: I disagree with you violently. They are matters which the Court will take into consideration. All right.

The court, as previously noted, imposed concurrent terms of three to five years in State Prison.

The Appellate Division rejected defendant's argument that the sentences were unlawful, reasoning that although there was an indication that the trial judge "considered" these arrests in fixing the sentence, there was no evidence that the sentences were influenced thereby. The court stated, "While a sentencing judge may 'consider' the recital in a presentence report which refers to previous 'arrests' which did not result in 'convictions,' under no circumstances should the mere fact of an 'arrest' influence the imposition of sentence, since the most innocent person may be arrested. 116 *N. J. Super.* at 525. The opinion emphasized that a presentence report is intended to give as complete a picture as possible of a defendant so that a proper sentence may be fixed. The court found no indication that the report was inaccurate or that the sentencing judge was otherwise misled by its contents.

In essence we agree with that determination of the Appellate Division, but, to the extent that the verbal exchange between the sentencing judge and the defense attorney suggests that possible impermissible influence might be given to the two arrests, the judge's comment was inadvisable. However, the sentences that were meted out belie an indication or assumption that any improper or prejudicial "consideration" was in fact given to those arrests; the sentences were eminently fair and reasonable, if not lenient, considering the nature of the crimes and the totality of the

record, including defendant's history of established criminal activity.

To minimize the possibility of uncertainty or ambiguity as to the degree to which a prior arrest not leading to a conviction may be taken into account by sentencing judges, we deem it advisable to discuss the matter in light of the pertinent legal authorities and in furtherance of fashioning a reasonable policy for judicial guidance.

The vice in the instant case centers about the use of the expression "will take into consideration." The connotation of the word "consideration" in its everyday usage is more general than precise. As defined in *Webster's New International Dictionary* (3 ed. 1968) at 483 it has a subjective meaning, including "to reflect on: think about with a degree of care or caution," "to think of, regard, or treat in an attentive, solicitous, or kindly way," and "to think: come to view, judge, or classify." A basic principle of our jurisprudence, one perhaps best known to the sentencing judges, is that such thought, reflection or deliberation, in connection with the contents of a presentence report, must exclude any inference of guilt to be drawn from an arrest not followed by conviction; that type of consideration is clearly impermissible.

In *State v. Farrell*, 61 *N. J.* 99 (1972), the challenged impropriety came not from remarks by the trial judge but from statements of the probation officer made in the presentence report. After making reference to several offenses for which defendant had been tried and acquitted, the author of the report commented, "it seems that defendant's crimes are finally catching up to him." (61 *N. J.* at 107). Although we held the remark objectionable, we declined to presume, in the absence of evidence to the contrary, that the trial court took the statement into consideration in determining the length of defendant's sentence; instead, we presumed that the court had disregarded it because the record demonstrated that the judge in sentencing defendant had

been primarily concerned with the evidence presented in the case together with defendant's one prior conviction.

Ordinarily, where there is an issue of prejudice claimed by a defendant, it is presumed that a sentencing judge disregarded incompetent or immaterial evidence in es-timating the appropriateness of a particular degree of punishment. See *State v. Pohlabel,* 61 *N. J. Super.* 242, 250 (App. Div. 1960). In that case the court found it unnecessary to decide what weight, if any, should be given to an arrest or series of arrests not followed by conviction.

A resolution of that problem would tend to reasonably implement the letter and spirit of the mandatory disclosure rule enunciated in *State v. Kunz,* 55 *N. J.* 128, 144–145 (1969). There we held that as a matter of rudimentary fairness defendants are entitled to disclosure of the presentence report "with fair opportunity to be heard on any adverse matters relevant to the sentencing." *Id.* at 144. The *Kunz* rule was designed to eliminate the recurring problem of a defendant being sentenced on the basis of inadequate or inaccurate information. See *State v. Pohlabel, supra,* 61 *N. J. Super.* at 242; *State v. Leckis,* 79 *N. J. Super.* 479 (App. Div. 1963); *State v. Barbato,* 89 *N. J. Super.* 400 (Cty. Ct. 1965); *cf. State v. Gottling,* 95 *N. J. Super.* 103, 110–111 (App. Div. 1967) (court may not rely on information not included in presentence report). We reasoned that unless the contents of the presentence report are disclosed to defendant, he has insufficient opportunity to meaningfully challenge the possible incompleteness or inaccuracy of the report. (55 *N. J.* at 141). The sentencing court, of course, should exclude from the report irrelevancies, confidential sources and diagnostic matters which would be harmful to defendant's rehabilitation if he were told about them, but all other materials having any bearing whatever on the sentencing must be included in the report. *Id.* at 144–145. See *R.* 3:21–2.

The usefulness of an arrest record is illustrated in the following excerpt from a respected text dealing with the preparation of presentence reports:

> \* \* \* There is some feeling that such arrests [those not leading to a conviction] should not be listed in the presentence report, and it is easy to agree that the judge's mind should not be prejudiced by misleading impressions of offenses not proven. \* \* \*
>
> In the sense of strict legal fairness to the defendant this is a piece of caution that has merit. However, there can easily be instances wherein the exclusion of such material would work against the real purpose of the presentence report. You may be reporting, for example, on a man who has just been convicted for the first time of a marcotics violation. Though this is the first actual conviction, you find that he has been arrested previously on many occasions because of suspected narcotics use or handling. Now this would be very essential information for the judge to have in making his decision. This is a record that at least tells what kind of associates the defendant has and indicates what the problems might be if he were granted probation. *Keve, The Probation Officer Investigates*, at 78 (1960).3

Comprehensive presentence reports which included references to prior arrests and juvenile offenses were reviewed

---

3This is an excerpt from a quotation taken from Keve's work as quoted in *State v. Scott*, 237 *Ore.* 390, 390 *P.* 2d 328 at 332 (Sup. Ct. 1964). Paul W. Keve is also the author of *Prison, Probation, or Parole?* (1954) and *Imaginative Programming in Probation and Parole* (1967) and holds or held advisory positions on a national level, *e. g.*, National Council on Crime and Delinquency and National Council on Social Work Education.

The need for caution is apparent for the collateral consequences of an arrest record may be substantial. It is a well-known fact that many employers inquire into a prospective employee's past involvement with the law, and will refuse to hire an individual if he has an arrest record, whether or not a conviction resulted. The President's Commission on Law Enforcement and the Administration of Justice reported that "[a]bout 75 percent of employment agencies sampled in a recent study of employment practices in the New York City area stated that they ask applicants about arrest records and, as a matter of regular procedure, do not refer any applicants with a record, regardless of whether the arrest was followed by a conviction." *President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society*, at 75 (1967). This same observation is made in *In re Fortenbach*, 119 *N. J. Super.* 124, 126–127, n. 1 (Cty. Ct. 1972).

by the Appellate Division in *State v. Johnson,* 67 *N. J. Super.* 414, 432–434 (App. Div. 1961). Judge Gaulkin in writing for the court recognized the value of such complete information not only to the sentencing judge but to a reviewing court in finally determining the appropriate sentences to be imposed upon the four young defendants who had been convicted of kidnapping and rape. *Cf. State v. Hodgson,* 44 *N. J.* 151, 164 (1965) and *State v. Jones,* 91 *N. J. Super.* 67, 72–73 (Law Div. 1966).

Moreover, the absence of any prior record of arrests in a comprehensive report could be significant in reaching an assessment that a custodial term may be counterproductive to the rehabilitative objectives of sentencing. See *State v. Ward,* 57 *N. J.* 75, 82 (1970) and *State v. Brennan,* 115 *N. J. Super.* 400, 408 (App. Div. 1971) (incarceration not generally appropriate for young first-time marijuana offenders).

To be emphasized is the point that many factors, including an arrest record, contribute toward the composite picture of the "whole man" that the trial court should necessarily have to rationally sentence a defendant. As stated by Mr. Justice Black for the Court in *Williams v. New York,* 337 *U. S.* 241, 247, 69 S. Ct. 1079, 1083, 93 *L. Ed.* 1337, 1342 (1949), after noting that a sentencing judge is not confined to the narrow issue of guilt but rather to the type and extent of punishment after a determination of guilt: "Highly relevant — if not essential — to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." He then pointed out that the concepts individualizing punishment in modern society have made it all the more necessary that the restrictive rules of evidence applicable to a trial should not deny a sentencing judge the opportunity to obtain the information required in his task of sentencing.

Courts in other jurisdictions have amplified on this need for total data and have considered arrest records a proper

source for information to enable a tailoring of the sentence to fit the offender as well as the offense, but in so doing have generally recognized that a defendant is to be offered the opportunity to be heard on the material contained in the presentence report in order to avoid any misconception of the facts on the part of the sentencing court.

In *State v. Scott*, 237 *Or.* 390, 390 *P.* 2d 328, 332–333 (Sup. Ct. 1964) (*en banc*), the court summarized the issues presented after conviction and at the time of sentencing thusly: "What is the character of the defendant? Will he be a menace to society if he is not incarcerated? Will he be more likely to respond to probation or to imprisonment?" and then declared, "On these issues the record of arrests is obviously very pertinent."

The Nebraska Supreme Court reached a similar determination stating:

It is a long accepted practice in this state that before sentencing a defendant after conviction a trial judge has a broad discretion in the source and type of evidence he may use to assist him in determining the kind and extent of punishment to be imposed within the limits fixed by statute. Highly relevant, if not essential, to his determination of an appropriate sentence is the gaining of knowledge concerning defendant's life, character, and previous conduct. In gaining this information, the trial court may consider reports of probation officers, police reports, affidavits, and other information including his own observations of the defendant. A presentence investigation has nothing to do with the issue of guilt. The rules governing due process with respect to the admissibility of evidence are not the same in a presentence hearing as in a trial in which guilt or innocence is the issue. The latitude allowed a sentencing judge at a pre-sentence hearing to determine the nature and length of punishment, other than in recidivist cases, is almost without limitation as long as it is relevant to the issue. [*State v. Rose*, 183 *Neb.* 809, 164 *N. W.* 2d 646, 648–649 (Sup. Ct. 1969)]

Other state and federal courts have also held that arrest records may be properly considered at sentencing,[4] and

---

[4]*People v. Escobar*, 122 *Cal. App.* 2d 15, 264 *P.* 2d 571, 574 (D. Ct. App. 1953) ; *State v. Willms*, 117 *N. W.* 2d 84, 87 (N. D. Sup. Ct.

several federal circuit courts have broadly concluded that evidence of past unresolved and unproved charges of criminal conduct not resulting in a conviction may be considered in imposing sentence.[5]

There is, of course, respectable authority supporting the contrary proposition that prior arrests and acquittals may not be considered by the sentencing court.[6] The ABA Ad-

1962) ; *State v. Caddell,* 265 *N. C.* 563, 144 *S. E.* 2d 621, 622 (Sup. Ct. 1965) *(per curiam)* ; *Jones v. United States,* 113 U. S. App. D. C. 233, 307 *F.* 2d 190, 192 (D. C. Cir. 1962), *cert.* den. 372 *U. S.* 919, 83 *S. Ct.* 733, 9 *L. Ed.* 2d 724 (1963).

[5]*Taylor v. United States,* 179 *F.* 2d 640, 642–643 (9 Cir. 1950), *cert.* den. 339 *U. S.* 988, 70 *S. Ct.* 1010, 94 *L. Ed.* 1389 (1950) ; *United States v. Doyle,* 348 *F.* 2d 715, 721 (2 Cir. 1965), *cert.* den. 382 *U. S.* 843, 86 *S. Ct.* 89, 15 *L. Ed.* 2d 84 (1965) ; *United States v. Marcello,* 423 *F.* 2d 993, 1012 (5 Cir. 1970), *cert.* den. 398 *U. S.* 959, 90 *S. Ct.* 2172, 26 *L. Ed.* 2d 543 (1970). And see *United States v. Weston,* 448 *F.* 2d 626, 633 (9 Cir. 1971), *cert.* den. 404 *U. S.* 1061, 92 *S. Ct.* 748, 30 *L. Ed.* 2d 749 (1972). Parenthetically we note that at least two states have permitted consideration at sentencing of ex parte material evidencing uncharged criminal conduct related to the crime for which defendant was being sentenced. *State v. Moore,* 93 *Idaho* 14, 454 *P.* 2d 51, 54–55 (Sup. Ct. 1969) ; *Waddell v. State,* 24 *Wis.* 2d 364, 129 *N. W.* 2d 201 (Sup. Ct. 1964).

[6]Case authority on the subject is somewhat limited possibly because as suggested in Annotation, "Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant," 96 *A. L. R.* 2d 768, 792, n. 3 (1964), "information as to arrests has frequently been included in the showing of the defendant's criminal record without any question as to that matter being raised or discussed." In addition to the annotation, Note, "Employment of Social Investigation Reports in Criminal and Juvenile Proceedings," 58 *Colum. L. Rev.* 702, 708, n. 47 (1958) contains citations *pro* and *contra,* as does *Rubin et al., The Law of Criminal Correction,* at 84, n. 49 (1963). The latter concludes that arrest records should not be included in the presentence report; *State v. Pohlabel, supra,* 61 *N. J. Super.* 242, which specifically reserved decision on the question (at 250) is cited in support of that conclusion.

One state, Massachusetts, by statute provides that the probation officer's report "shall not contain as part thereof any information of prior criminal prosecutions, if any, of the defendant, wherein the defendant was found not guilty by the court or jury * * *." *Mass. Gen. Laws Ann., Ch.* 276, § 85 (1972). Whether all arrests are similarly excluded is not specified.

visory Committee on Probation has taken the position that a prior criminal record contained in a presentence report should include "only those charges which have resulted in a conviction." *ABA Standards, Probation,* Commentary at 37 (Approved Draft 1970). The explanation is that "[a]rrests, juvenile dispositions short of an adjudication, and the like, can be extremely misleading and damaging if presented to the court as part of a section of the report which deals with past convictions." *Id.* The approach of the ABA Committee appears to be particularly aimed at eliminating sentences based upon erroneous presentence report material, an evil substantially minimized by the existence of a mandatory disclosure rule. It must be remembered that New Jersey is among a minority of jurisdictions that require mandatory disclosure to a defendant of his presentence report.[7]

Defendant relies heavily upon *People v. Riley,* 376 *Ill.* 364, 33 *N. E.* 2d 872 (Sup. Ct. 1941), *cert.* den. 313 *U. S.* 586, 61 *S. Ct.* 1118, 85 *L. Ed.* 1542 (1941). There, at a hearing in aggravation and mitigation of sentence following defendants' pleas of guilty to the murder of two policemen, the prosecutor read into the record three prior arrests of defendants not followed by conviction. The arrests of one defendant had occurred 19 and 22 years previously; the arrest of the other defendant was 8 years old. The court held that the arrests were not properly admissible at the hearing but in the circumstances found no abuse of judicial discretion in the imposition of the death penalty by reason of these "trivial and unimportant" errors. (33 *N. E.* 2d at 877). The court reasoned that exclusion of the arrests was

[7]See Annotation, "Defendant's right to disclosure of presentence report," 40 *A. L. R.* 3d 681, 701–703 (1971). For a discussion of the problems of inadequacies and inaccuracies of presentence reports which nondisclosure promotes, see *ABA Standards, Sentencing Alternatives and Procedures* (Approved Draft 1968), § 4.4 and Commentary at 218–221.

necessary in order to protect the judge's mind from the possible prejudicial effect of incompetent evidence.

*Riley* has been approvingly cited in later Illinois decisions for the theorem that prior arrests which do not result in convictions may not properly be considered in passing sentence; however, as in the *Riley* decision itself, the error is usually found to be harmless. Compare *People v. Grigsby*, 75 *Ill. App.* 2d 184, 220 *N. E.* 2d 498 (App. Ct. 1966) with *People v. Lawson*, 131 *Ill. App.* 2d 612, 266 *N. E.* 2d 735 (App. Ct. 1971) and *People v. Loomis*, 271 *N. E.* 2d 66 (Ill. App. Ct. 1971).

Defendant also cites two recent Alaska cases, *Waters v. State*, 483 *P.* 2d 199, 202–203 (Alaska Sup. Ct. 1971) and *Robinson (George Ronald) v. State*, 484 *P.* 2d 686, 690, n. 11 (Alaska Sup. Ct. 1971), which follow in substance the legal circumspection that guided the court in *People v. Riley*, *supra*. Note also *Robinson (Willie James) v. State*, 492 *P.* 2d 106, 107 (Alaska Sup. Ct. 1971) where the court restated the rule in this manner, "a recital of a history of police contacts, *without further explanation* is improper and should not be considered by the trial judge." (Emphasis added). There was no elaboration upon the intended meaning of the words italicized. However, the court proceeded to find that the awareness of the trial judge as to the disposition of the police contacts listed on defendant's "rap sheet" "removes the spectre of prejudicial error." 492 *P.* 2d at 107. Oddly enough none of these cases discussed or distinguished the earlier decision of the Alaska Supreme Court in *Egelak v. State*, 438 *P.* 2d 712 (Alaska Sup. Ct. 1968).

*Egelak* found no error in the inclusion in a presentence report of a reference to defendant's previous indictment for, and acquittal of, the crime of manslaughter. The court followed the legal approach adopted in *Williams v. New York*, *supra*, 337 *U. S.* 246, 69 S. Ct. 1079, and *Thompson v. State*, 426 *P.* 2d 995, 999–1000 (Alaska Sup. Ct. 1967), where there was a finding of no error by reason of a reported refer-

ence to defendant's admission of guilt as to two charges that had been dismissed. Attention was also directed to *State v. Scott, supra,* 390 *P.* 2d 328, wherein the Oregon Supreme Court observed that sentencing judges know the difference between arrest and conviction and are aware of the possible instances in which a person is arrested although his conduct is exemplary but, explained the court, "* * * The possibility of harm from furnishing the sentencing court with a convicted defendant's arrest record we consider remote and heavily outweighed by the importance of providing the sentencing court with such information." (438 *P.* 2d at 717, n. 17, citing *Scott, supra,* 390 *P.* 2d at 333).

In our view an arrest could be relevant for several reasons. One is that it may lead to factual material which the defendant does not contest and which may bear upon the character of the sentence. For example, the arrest may relate to an offense the defendant does not dispute, which offense was disposed of without further action as part of a plea bargain involving other offenses. Again, the sentencing judge might find it significant that a defendant who experienced an unwarranted arrest was not deterred by that fact from committing a crime thereafter. There may be still other reasons depending upon the total circumstances which could warrant at least consideration of the fact of an arrest. We need not try to anticipate all situations. The important limitation of course is that the sentencing judge shall not infer guilt as to any underlying charge with respect to which the defendant does not admit his guilt.

We are satisfied in the present case that the challenged items in the arrest report of Ulious in no way influenced the sentencing court to enlarge or enhance the penalties that were imposed. If the arrests not followed by convictions are completely disregarded as irrelevant, the record nevertheless amply demonstrates that the sentences on the convictions for assault and battery on a police officer and threatening life, which were well within statutory limits, should not be disturbed. Those sentences were so just and reasonable that

this Court under *R.* 2:10–3 would impose no less and it would serve no useful purpose to remand to the trial court for a resentencing.

The convictions of Ulious and Jesse on the weapons charges are reversed and the respective concurrent sentences for those offenses are set aside.

The remaining judgments of convictions and sentences imposed thereon are affirmed.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB, Justices JACOBS, HALL, MOUNTAIN and SULLIVAN, and Judges CONFORD and LEWIS—7.