186 N.J. Super. 517 (1982)
453 A.2d 246
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT KEITH STEWART, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 5, 1982.
Decided October 28, 1982.
Before Judges MATTHEWS, ANTELL and FRANCIS.
Mark H. Friedman, Asst. Deputy Public Defender, argued the cause for appellant (Joseph H. Rodriguez, Public Defender, attorney).
*518 Frank M. Gennaro, Deputy Atty. Gen., argued the cause for respondent (Irwin I. Kimmelman, Atty. Gen., attorney; Katherine F. Graham, Deputy Atty. Gen., of counsel and on the letter-brief).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
The trial of this case centered on the allegation that defendant robbed William Hampton on May 25, 1981, at around 8:30 p.m., while Hampton was waiting for a bus at the corner of Atlantic and South Carolina Avenues in Atlantic City. Hampton claimed that defendant jumped out of the Ford pickup in which he had been riding, stuck a flare gun into his side and robbed him of $50. Defendant denied that he took any money, made any threats or used any firearm during the incident; instead, he claimed that he had merely grabbed a bag of marijuana out of Hampton's hand after Hampton offered to sell some of the "reefer" to codefendant Longnecker. The jury's verdict, as well as their request for the reading of defendant's testimony during deliberations, made it clear that they believed defendant's testimony rather than Hampton's, and both the judge and the prosecutor recognized this fact during the post-trial proceedings. Accordingly, we accept defendant's account of the incident as the factual basis for this appeal.
Defendant, a native of Florida, testified that he and one Blewitt, the owner and driver of the Ford pickup, had stopped in New Jersey prior to the date in question to visit a friend in Willingboro. They met Longnecker, the third defendant, at the hotel where they were staying. On the day in question the three had travelled to Atlantic City to do some gambling in the Resorts Hotel Casino.
Defendant and Blewitt had been travelling in the Ford pickup since they left Tennessee, and almost all of defendant's possessions were stored in the truck. The flare gun, which defendant *519 had used on his boat in Florida, had been kept on the dashboard of the truck during the trip from Tennessee. Among the articles kept behind the seat of the truck were an air rifle with a broken stock and a CO2 rifle that had been kept in a cloth bag. Defendant testified that he had used the two rifles to hunt birds and squirrels in the woods of Florida and Tennessee. He denied that he had ever used them against any persons.
Blewitt was driving, Longnecker was in the passenger seat and defendant was sitting between them when they got into the truck for the return trip to Willingboro. Defendant was "fooling" with the stereo when the car stopped for a red light at Atlantic and South Carolina Avenues. While the truck was stopped Hampton approached it on the passenger side, pulled out a plastic bag of marijuana and apparently offered to sell some to Longnecker, who asked defendant for some cellophane in which to keep the marijuana. When the traffic light changed, however, defendant grabbed the bag of marijuana from Hampton's hand. When Hampton clutched at the bag it tore in half, leaving defendant with the marijuana and Hampton with a piece of plastic. When he saw that the truck was being followed, defendant tossed the flare gun into the truck's cab and hid the marijuana under his pants. He was certain, however, that Hampton had seen the flare gun on the dashboard during the incident.
After the truck drove off, Hampton flagged down Officer Mark Stiles, a motorcycle policeman passing nearby, and told him that he had been robbed by the men in the truck.
Stiles then flagged down Officers Richard Kraly and Edward Shepperson, who were in a nearby police car, and the three officers pulled the truck over and searched defendants. Stiles then brought Hampton to the scene of the stop and an identification was made. The flare gun, the air rifle and the CO2 rifle were found in the well behind the seat of the truck. All three weapons were later determined to be operable.
As mentioned earlier, defendant gave a statement to the police in which he denied committing an armed robbery of *520 money but admitted that he had taken the "reefer" from Hampton. Although Stiles claimed he found the ripped bag of marijuana on defendant's person, defendant claimed that it was found only after he told the police where he had hidden it.
The trial judge dismissed counts five and six of the indictment prior to the charge because the air gun and the CO2 gun did not fit the statutory definitions of "rifle" or "shotgun." Nonetheless, he allowed the jury to take these guns into consideration in answering question four of the verdict sheet which related to the Graves Act. Defendant was convicted of second degree (unarmed) robbery, but was given a mandatory minimum because the jury answered question four in the affirmative.
The Graves Act, N.J.S.A. 2C:43-6(c), provides a mandatory prison sentence for one who possesses a firearm "while in the course of committing or attempting to commit" any one of several specified crimes. The reach of the act extends to those in possession of a firearm in "the immediate flight" from the commission or attempt to commit one of the crimes. Neither the term "possession" nor the term "flight," however, is defined in this section of the Code of Criminal Justice. It is defendant's contention that the Graves Act does not apply in this case and, therefore, the trial judge was free to impose any sentence authorized by law.
The manifest intent of the Graves Act was to penalize more harshly those who arm themselves before going forth to commit crimes. The intent of the Legislature in passing the Graves Act can best be effectuated by interpreting it to mean that the firearm must be used, or be purposefully available for use, to facilitate the actual commission of the crime or to aid in the perpetrator's "get-away." It is the increased danger posed by armed criminals that is the reason for the statute. If the criminal does not arm himself or have arms readily available for use in committing the crime, the increased danger is not present.
The trial judge instructed the jury that their answer to the "factual determination outlined in question number 4" was necessary in "order to permit the Court to appropriately grade *521 the robbery offense, should you so find a defendant guilty...." He then instructed the jury, in effect, that the defendant could "possess" a firearm for the purpose of the Graves Act even if he did not use it or display it or was not even armed with it during or after the commission of the crime. The jury subsequently acquitted defendant of armed robbery and illegal possession of the flare gun but answered "yes" to question 4. The result was a verdict which was best summarized by the trial judge:
Here the jury found and, as I have said, I have accepted, while forceably (sic) snatching a bag of marijuana from the victim the defendant possessed a firearm. The firarm (sic) could have been one of three, or all three items, a flare pistol and two pellet rifles, which were in the truck, and as found by the jury I'm satisfied merely possessed during or at least in the flight after, not used.
The factual predicates for the jury's answer to question four are found in the testimony of defendant and Officer Shepperson. The jury's verdict presupposes that defendant truthfully testified that the flare gun was sitting harmlessly on the dashboard during the "snatch" of the marijuana. The acquittals of first degree robbery, which the trial judge limited to robbery committed when a defendant "is armed with, or uses or threatens the immediate use of a deadly weapon," and illegal possession of the flare gun represent the jury's belief that the flare gun was not possessed for any unlawful purpose whatsoever. A similar conclusion can be drawn with respect to the air gun and the CO2 gun. Defendant was never charged with unlawful or manifestly inappropriate possession of these guns; indeed, the only charges that related to these guns did not even reach the jury because they did not fall under the definitions of "rifle" or "shotgun" in N.J.S.A. 2C:39-1(m) and (n). See also N.J.S.A. 2C:58-3(b). Defendant never used or displayed these guns and the victim never even saw them; indeed, Officer Shepperson noted that it would have been impossible for Hampton to have seen them since they could not be seen unless one searched behind the seat for them. The obvious conclusion is that although defendant had constructive possession of three items that may have fit the definition of "firearm" in N.J.S.A. 2C:39-1(f), he was not "armed" with them during the incident with Hampton because they *522 played absolutely no part in the crime that was committed. There is no evidence that defendant used them for criminal purposes or that they were intentionally possessed for use in a criminal enterprise.
It would surely be an anomolous result for defendant not to have committed a robbery while "armed" and yet be punished under the Graves Act, N.J.S.A. 2C:43-6(c). Such a result can be avoided by reading the two Code provisions in pari materia. This is a logical result since their language apparently had a common source. As stated in Palmer v. Kingsley, 27 N.J. 425, 429 (1958): "It is a cardinal principle of statutory construction that statutes relating to the same or similar subject matter  statutes in pari materia  are to be construed together."
Here, both statutes, N.J.S.A. 2C:15-1(b) and N.J.S.A. 2C:43-6(c), relate to the same or a similar subject: the increased penalties to be imposed upon armed criminals. As the Supreme Court has instructed, "it is identity or similarity of purpose or object that most convincingly justifies resort to the rule of in pari materia as an aid in statutory construction." State v. DiCarlo, 67 N.J. 321, 325 (1975). Where, as in this case, one statute (the Graves Act, N.J.S.A. 2C:43-6(c)), makes specific reference to another (N.J.S.A. 2C:15-1), the use of this rule of statutory construction is most appropriate. Mimkon v. Ford, 66 N.J. 426, 434 (1975).
Defendant's position regarding the construction of the term "possession" in the Graves Act, N.J.S.A. 2C:43-6(c); N.J.S.A. 2C:39-4(a), is not without precedent. A very useful analogy can be drawn to N.J.S.A. 2A:151-5, the "while armed" feature of pre-Code law, which, like the Graves Act, provided for special sentencing for a defendant who committed certain crimes "when armed with or having in his possession any firearm..." Notwithstanding the fact that the phrase, "having in his possession," was found in the statute, courts have usually ruled that the legislation "aggravates the punishment where the crime of robbery is perpetrated with arms" (emphasis added). State v. La Vera, 35 N.J. Super. 256, 258 (App.Div. 1955); cf. State v. *523 Quinones, 140 N.J. Super. 237, 240 (App.Div. 1976), aff'd 75 N.J. 391 (1978) ("The obvious purpose was to deter the use of weapons during the commission of, or attempt to commit, these newly enumerated crimes of violence...."); State v. Sempsey, 141 N.J. Super. 317, 326 (App.Div. 1976) ("The legislative intent in the passage of that statute was to punish for robbery while armed with a dangerous instrument"). Even the display of what looked like a weapon came within the scope of N.J.S.A. 2A:151-5 because "[t]he evil contemplated by the statute is the possession of any object or device, during the commission of one of the enumerated crimes, which if purposely used contains a capacity for the mere threatening of harm" (emphasis added). State v. Brewer, 142 N.J. Super. 70, 76 (App.Div. 1975), aff'd o.b. 70 N.J. 329 (1976). We know of no case in which a conviction under this statute was based on possession of a weapon which, if not used or displayed, was not arguably motivated by the intent to have the weapon available for use in the crime ultimately committed. Cf. State v. Cooper, 140 N.J. Super. 28, 34 (Law Div. 1976), rev'd on other grounds 165 N.J. Super. 57 (App.Div. 1979), app. dism. 81 N.J. 261 (1979).
A review of the legislative history of the Graves Act itself gives ample indication that the Legislature intended to have the application of the measure depend on a nexus between the possession of a weapon and the crime committed. The original bill introduced by Senator Graves was an amendment to chapter 39 of Title 2C, which would have provided mandatory penalties for a person committing a crime "who knowingly has in his possession any firearm...." When Senate Bill 1071 reached the Assembly it was initially recast as an amendment to N.J.S.A. 2C:39-4 (possession of weapons for unlawful purposes). The Assembly Judiciary Committee Statement of July 24, 1981, which accompanied this version of the bill made specific the intent of this bill and those that followed it:
Crimes committed with guns are on the rise and deaths from these weapons are also increasing. Guns are particularly dangerous weapons, all too easy to use and to kill with if used. The purpose of this bill is to make criminals think twice before going forth to commit crimes armed with guns.
*524 The bill that ultimately passed the Legislature was an amendment to N.J.S.A. 2C:43-6 that parallels the present Graves Act in its limitation to persons convicted of specific crimes, including, significantly, possession for an unlawful purpose (N.J.S.A. 2C:39-4(a)).
Governor Byrne vetoed S-1071 on December 11, 1980. In his veto message the Governor stated that he agreed "wholeheartedly with the underlying purpose of this bill; namely, to reduce significantly the rate of violent crimes committed with firearms by insuring that those committed of such offenses are sentenced to prison" (emphasis added). He also noted that the Legislature had adopted this bill instead of a more comprehensive one that had been offered by then-Senate President Merlino which would have provided mandatory penalties for simple unlawful possession of firearms. Senate Bill 3057, which the Governor did sign, was substantially identical to the version of N.J.S.A. 2C:43-6(c) contained in Senate Bill 1071 except for the number of crimes to which it applied. The Statements accompanying the bill show a legislative intent that is no different from that set forth in the Assembly Judiciary Committee's Statement of July 24, 1980.
During the sentencing hearing the prosecutor argued that the Graves Act applied to the facts accepted by the jury because of the bill's reference to possession during "flight." Ironically, however, it is the "flight" language that best supports defendant's position because the phrase "immediate flight therefrom" is identical to that used in the robbery statute itself. N.J.S.A. 2C:15-1 was borrowed in large measure from the A.L.I. Model Penal Code and Commentaries, § 222.1. The Commentary to § 222.1 explains the purpose of the "flight" language:
Section 222.1 thus includes as robbery the conduct of a person who, having obtained or attempted to obtain the property, threatens or uses the specified force to retain the property, to escape, or to prevent pursuit. The thief's willingness to use force against those who would restrain him in flight suggests that he would have employed force to effect the theft had the need arisen. Thus, such an actor is presumably a person who presents the special dangers that the robbery statute is designed to reach and who is an appropriate subject for the sanctions designed for that offense. [Model Penal Code § 222.1, comment (2)(b) at 104 (Official Draft 1980); emphasis supplied].
*525 See, also, II Commentary: Final Report of the New Jersey Criminal Law Revision Commission, comment to § 2C:19-1 at 214 (1971).
In order "to harmonize the law relating to the same subject matter," State v. Green, 62 N.J. 547, 554 (1973), and to be consistent with the manifest purpose of both the Graves Act and the robbery provision of the Code, we find that the provisions of the Graves Act should be held to apply only when the offender arms himself in order to commit a crime or, if not armed when he begins his criminal venture, comes into possession of a firearm which he then utilizes to effectuate his escape or prevent pursuit. To hold to the contrary would give rise to situations that can only be described as bizarre. Under the trial judge's interpretation, the Graves Act would apply to a mugger who has constructive possession of a gun locked in the trunk of a car near the scene of a purse snatching with the actor committed while unarmed and on foot. To apply the Graves Act to the present situation, where defendant was simply in constructive possession of firearms which the jury found he had no intent to use during the crime, would extend the purpose of the bill beyond that which was sought to be accomplished.
Defendant's sentence is vacated and the case remanded to the Law Division for resentencing. We do not retain jurisdiction.