Austin K. **MUTZ** and Alice K. Mutz, Appellants,

v.

**CITIZENS STATE BANK OF MARYVILLE, Appellee.**

No. 91–2118.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1992.

Decided June 12, 1992.

Rehearing and Rehearing En Banc Denied July 17, 1992.

James P. Tierney, Kansas City, Mo., argued (Douglas Dalgleish, on the brief).

Douglas P. McLeod, Kansas City, Mo., argued (Karl Zobrist, on the brief).

Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, Circuit Judge, and WELLFORD,* Senior Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

This case arises out of the negotiated settlement of a loan between Austin and Alice Mutz and Citizens State Bank of Maryville. After the loan had been settled and a release executed, the Bank endorsed and deposited into its account two checks made payable to the Mutzes from Pride Pipeline Company, an oil and gas producer which was leasing land owned by the Mutzes, in the amount of $114,181.06. The Mutzes filed suit against the Bank, alleging that this action violated the terms of the mutual release signed by the parties. The Bank denied any wrongdoing and asserted the mutual release as an affirmative defense to the plaintiffs' claims, arguing that its actions were permitted under the terms

* The Hon. Harry W. Wellford, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

of the release. Both parties moved for summary judgment. The District Court granted the Bank's motion for summary judgment, holding that the Mutzes' claims were barred by the mutual release. From this decision the Mutzes appeal. We reverse.

I.

The Mutzes have a long history in the oil and gas business. Beginning in 1948, with his operation of small gas stations in and around Maryville, Missouri, Austin Mutz began gradually expanding his position in the industry. During the 1960s, the Mutzes converted their business from operating to leasing stations and purchasing petroleum products for the purpose of resale to retailers. The Mutzes graduated to investing in oil and gas properties in Texas and Kansas during the late 1970s. These investments gave the Mutzes a fractional share in the properties along with the risk and expense of drilling and maintaining the oil wells.

To finance these investments, the Mutzes entered into a series of loan transactions with various Texas banks. As collateral for these loans, the Mutzes executed several deeds of trust and assignments of production covering their investment properties. Included in these assignments were the two leases which produced the disputed checks in this case: the "Ed Ford" leases and the "Double M Ranch" lease.

In the early 1980s, as a result of the drop in the oil market, the Citizens National Bank in Abilene, the bank which held the Mutzes' loan, encouraged the Mutzes to refinance their loan elsewhere. The Mutzes approached Citizens State Bank of Maryville for this purpose. The Bank agreed to refinance their loan if the Mutzes obtained a guarantor. This was accomplished when Mr. Mutz's sister and brother-in-law (the Fosters) allowed their farm to be used as security for the loan. The Mutzes then executed a note for $1,304,-

677.33 in April of 1982. In addition, the Mutzes executed new assignments to the Bank which provided, as security for the loan, any "proceeds of any sale of oil, gas[,] and other minerals" from the property subject to the deed of trust. Appendix 250. These assignments also covered the "Ed Ford" leases and the "Double M Ranch" lease.

This arrangement between the Mutzes and the Bank proceeded smoothly for a few months. As the oil market worsened in 1983, however, the Mutzes were unable to meet the established loan repayment schedule.[1] Although the loan was renegotiated several times, the situation did not improve. The Mutzes had, however, reduced the note to approximately $600,000. On August 1, 1987, the Mutzes and the Bank entered into an "Agreement Respecting Indebtedness." Under this agreement, the Mutzes assigned to the Bank the right to sell the collateral used to secure their loan. In return, the Bank agreed not to attempt further collection on the note from the Mutzes. The Bank would look solely to the Fosters for any further repayment. Appendix 268. Assignments given to the Bank, however, did cover "any and all of [the Mutzes'] interests in the above described Leases...." Appendix 288, 291.

After exploring the option of selling the collateral, the Bank decided to hold onto these oil and gas interests. The Bank valued these leases at $120,000. The Bank then entered into negotiations with the Fosters to settle the remainder of the Mutzes' account. The Fosters agreed to convey their farm to the Bank in return for full settlement of the Mutz loan, a return of $100,000 to the Fosters, and a payment to the Fosters of a maximum of $5,000 for legal fees. The Bank eventually sold the farm for $780,000, an amount greater than the remaining balance of the Mutz loan. This amount, coupled with the value of the Mutzes' leases, resulted in the realization of $900,000 for the Bank on the Mutzes' loan.

To complete the loan settlement, the Mutzes, the Fosters, and the Bank entered into a mutual release. The Bank was released from any claims:

in any way relating to or connected with a loan (the "Loan") made by the Bank to the Borrowers and guaranteed by the Guarantors pursuant to a Guaranty Agreement dated April 15, 1982 or any extensions or modifications thereof, or any documents executed by any party hereto in connection therewith or any collection efforts taken by the Bank in connection therewith.

Appendix 299. For their part, the Bank agreed to release the Mutzes and the Fosters from:

any and all manner of actions, causes of action, suits, proceedings, damages whatsoever in law or in equity in any way relating to or connected with the Loan made by the Bank to the Borrowers and guaranteed by the Guarantors pursuant to a Guaranty Agreement dated April 15, 1982 or any extensions or modifications thereof, or any documents executed by any party hereto in connection therewith.

Appendix 299.

On July 27, 1988, more than a month after the mutual release was signed, the Bank received two checks from Pride Pipeline Company, an oil and gas producer operating on some of the property covered by the Mutz leases, in the amount of $114,181.06. These checks, which were made payable to the Mutzes, represented funds earned between September of 1980 and January of 1986.[2] The Bank endorsed these checks with a stamp it had previously used to endorse checks payable to the Mutzes and deposited them directly into the

---

1. Prior to the worsening of the market, the repayment of the loan was handled in this fashion: Royalty checks were sent to the Mutzes in care of the Bank. Under an agreement with the Bank, these checks were deposited into the Mutzes' personal account at the Bank, with certain amounts being transferred for the Mutzes' personal needs, as well as to cover drilling expenses and income taxes on the proceeds. The remaining balance of the royalty payments was then applied to the Mutzes' loan.

2. Pride Pipeline had apparently been holding this money in a "suspense account" while awaiting instructions on who the payee was to be.

Bank's own account. The Bank did not tell the Mutzes about the checks at the time.

When finally informed of this action, the Mutzes sought a return of the funds. Specifically, the Mutzes claimed that the Bank was entitled only to prospective earnings from the Mutzes' leases, i.e., earnings after August 1, 1987, the date the Agreement Respecting Indebtedness was signed. After negotiations failed, the Mutzes filed suit alleging conversion and unjust enrichment. On April 29, 1991, the District Court granted the Bank's motion for summary judgment. The Court held that the mutual release covered the two Pride Pipeline checks, and thus that the Mutzes' claims were barred. This appeal followed.

## II.

When deciding a motion for summary judgment, "the plain language of Rule 56(c)" requires the entry of judgment if there is no dispute as to any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order for there to be a "genuine issue of material fact," the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the present case, the District Court held that summary judgment was appropriate because the Mutzes' claims were governed by the mutual release. Because that document released the Bank from any and all claims the Mutzes may have had arising from the loan transaction, the Court reasoned that the checks, which represented money earned from the Mutzes' leases between 1980 and 1986, were rightfully the Bank's. The Mutzes have appealed, asserting that summary judgment is inappropriate because there are issues of material fact which need to be resolved.

In order to determine whether summary judgment was appropriate, we must focus our attention on the mutual release. Under Missouri law, when construing a release, "the intention of the parties is controlling." *Haines v. St. Charles Speed-*

*way, Inc.*, 689 F.Supp. 964, 969 (E.D.Mo. 1988), *aff'd*, 874 F.2d 572 (8th Cir.1989). " 'Any question regarding the scope of a release is to be determined according to what fairly may be said to have been within the contemplation of the parties at the time the release was given.' " *Id.* (quoting *Montrose Savings Bank v. Landers*, 675 S.W.2d 668, 670–71 (Mo.App.1984)). This, "in turn, is to be resolved in the light of all the surrounding facts and circumstances under which the parties acted." *Williams v. Riley*, 243 S.W.2d 122, 124 (Mo.App. 1951).

While the Bank is correct when it states that the Mutzes and the Fosters released it from "any and all manner of actions, causes of action, suits, proceedings, damages, claims and demands whatsoever in law or in equity in any way relating to or connected with [the] loan," it is equally true that the Bank made the same promise to the Mutzes. In addition, the Agreement Respecting Indebtedness protected the Mutzes from "any additional action against [them] to seek payment or satisfaction of the debt evidenced by the Note or seek any deficiency against [them] should the sale of the collateral ... result in receipt by the Bank of net proceeds in an amount less than the outstanding balance due on the Note." Appendix 268. In resolving this dispute, the District Court decided that the mutual release protected the Bank in a situation such as this, where past proceeds from oil and gas profits were forwarded to the Mutzes on a date after the execution of the release. The Mutzes disagree, arguing that by endorsing and depositing these checks, the Bank took further collection actions against them, actions which violated the Agreement Respecting Indebtedness. Appendix 268.

These divergent positions indicate a need for trial. The Bank's position may indeed be correct. The mutual release does seem to absolve it from any liability to the Mutzes for further actions taken with regard to this loan. As the Bank argues, the checks which gave rise to this dispute were the result of oil production on properties which have been assigned to the Bank as

part of the collateral for the loan. Thus, under this analysis, these checks represent funds belonging to the Bank under the terms of the release.

However, the Mutzes' interpretation of these documents is equally plausible. The Agreement Respecting Indebtedness, a document which was not erased by the mutual release, prohibits the Bank from taking any further collection action against the Mutzes. In it, the Bank agreed that after receiving the Mutzes' collateral, it would look solely to the Fosters for repayment of the loan. As this money represents production between 1980 and 1986, the Bank's appropriation of these funds could be viewed as a further collection effort prohibited by the Agreement Respecting Indebtedness, and, by implication, the mutual release. It is clear that if this money had been delivered to the Mutzes when it was earned, i.e., between 1980 and 1986, it would have been handled in the same manner as all other royalties received during those years, thus reducing the amount of the loan by the amount of the checks (less the usual amounts withheld to cover taxes and expenses). A valid argument could be made that these checks should not be treated any differently simply because they arrived years after the money was actually earned, and after the execution of the mutual release and the Agreement Respecting Indebtedness.

■ When we evaluate a release, the words, if unambiguous, control. However, when the release is ambiguous, the focus turns to the intentions of the parties in drafting the document. See *Grand Motors, Inc. v. Ford Motor Co.*, 564 F.Supp. 34, 42 (W.D.Mo.1982). In determining the scope of the release, the courts must look to what " 'fairly may be said to have been within the contemplation of the parties at the time the release was given.' " *Haines*, 689 F.Supp. at 969 (quoting *Montrose Savings Bank v. Landers*, 675 S.W.2d 668, 670–71 (Mo.App.1984)). The mutual release is ambiguous in its application to the

situation we have in this case; thus, there remain questions of material fact concerning what the parties were contemplating at the time the release was executed.

■ There is evidence, sufficient to create a genuine issue of fact, that the parties may not have intended for the mutual release to cover this dispute. For one thing, if the money had been forwarded to the Mutzes at the time it accrued, it is doubtful that they would have been in default in 1987 when the Agreement Respecting Indebtedness was executed. Secondly, the Bank's valuation of the leases at $120,000 in 1987 and 1988 could be viewed as an indication that it was not contemplating such a large influx of cash.[3] Finally, some of the correspondence sent by the Bank to various parties involved in this case could be viewed as indicating that the Bank was concentrating solely on future income. For instance, in a March 14, 1988, letter to the Mutzes, Mr. Hall, the Bank President, notes that the transfer of the leases to the Bank was effective on September 1, 1987. Appendix 295. In an October 31, 1988, letter to Harold Voggesser, the Mutzes' accountant, Mr. Hall states that the Bank is "entitled to any and all royalties paid on or after August 1, 1987...." Appendix 332. A possible interpretation of these letters is that the Bank was entitled only to future, as opposed to past, earnings. Furthermore, in his deposition, Mr. Hall stated that no one involved in this litigation, i.e., the Mutzes, the Bank, the Fosters, or the attorneys, was aware that this amount of money was being held in suspense. Appendix 520. When viewed together, this evidence casts doubt upon the notion that the mutual release was designed to cover this situation.

In short, this case presents a question of material fact which cannot be resolved on summary judgment. The mutual release, which was the basis for the District Court's decision, protects both the Bank from further claims by the Mutzes and the Fosters, and the Mutzes from further actions taken

---

**3.** In reaching its valuation, the Bank determined that the leases would generate approximately $3,000 to $5,000 per month in royalty income.

The $114,000 amount of these checks almost reaches this $120,000 total without any future income at all.

by the Bank with regard to this loan. There is a question of what the mutual release means in a situation where a substantial amount of money, held in suspense by an oil and gas producer, was delivered years after it actually accrued. This is a question which cannot be answered without a trial.

The judgment of the District Court is reversed, and the cause remanded for further proceedings consistent with this opinion.

It is so ordered.

WELLFORD, Senior Circuit Judge, dissenting.

Because I agree with the district court's analysis and conclusion in this case, I respectfully dissent.

The plaintiffs have been investing in Texas and Kansas oil since at the 1970's. At all times pertinent to this appeal, they were represented by competent counsel. As the district court noted, this "is not a case where the Bank took advantage of an unsophisticated debtor."

As the majority explained, the parties in this action have a long and involved financial history. Their relationship began when the Bank loaned the plaintiffs money to invest in oil. When the parties realized that the plaintiffs could not meet their loan obligations, they entered into a plan whereby the plaintiffs could satisfy their debt through the proceeds of a farm, which had been posted as collateral for the debt. The farm fortuitously sold at a generous price, and the debt was fully satisfied. At the conclusion of the deal, the parties signed a mutual release, which release protected both the plaintiffs and the Bank from any further claims "in any way relating to or connected with the Loan made by the Bank to the [plaintiffs]."

In my view, the mutual release signed by the parties was unambiguous, and by its clear language it bars the plaintiffs' suit below. Although it is true that the intention of the parties governs a release, the scope of "that intent is to be determined from the language of the release. The intention of the parties to a release or its legal effect as evidenced by its language cannot be contradicted or varied by parol or extrinsic evidence." *State ex rel. Stutz v. Campbell*, 602 S.W.2d 874, 876 (Mo.Ct.App. 1980) (citations omitted). The majority finds ambiguity in the language of the release because of certain extrinsic documents, *e.g.*, the Agreement Respecting Indebtedness and 1988 correspondence between the plaintiffs and the Bank. It does not purport to find ambiguity in the language of the release itself. In actuality, the broad, plain language of the release prevents claims that in *any* way *relate to* the loan transaction at issue. The parties agree that the Pride Pipeline checks represent proceeds that originally secured the Bank's loan.

The question in this case is not whether the Bank is entitled to the checks. Rather, the issue is whether the mutual release bars this action by the plaintiffs. The majority suggests that the release did not cover this action because neither party knew of the existence of the Pride Pipeline checks at the time the release was signed, and that the parties may not have anticipated this situation. But as the district court stated, "[t]he possibility that all lease income was not accounted for can fairly be said to [have been] within the contemplation of the parties. Both parties to a release take a risk that future events will weigh in favor of the other party. By entering a release, the parties accept that risk for the security of repose."

The majority also concludes that the parties may have contemplated that pre–1987 transactions were not covered by the release. In my view, however, if the parties had intended to limit the release to transactions made in a certain time frame, the release would have so stated. "To the contrary, the release bars 'any and all ... claims ... whatsoever ... in anyway relating to or connected to' the loan." I believe that the Bank's acceptance of the Pride Pipeline checks was clearly related to and connected to the loan transaction, and that any action thereon is barred by the mutual

release, which was signed after advice of counsel.[1]

---

1. These plaintiffs may wish to pursue action against Pride Pipeline for holding their checks for so long without giving any notification. Nevertheless, a cause of action cannot proceed against the defendant Bank.