

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-1996

# Gares v. Willingboro Twp

Precedential or Non-Precedential:

Docket 95-5269

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Gares v. Willingboro Twp" (1996). *1996 Decisions.* Paper 109.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/109

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5269


MARGARET GARES

v.

WILLINGBORO TOWNSHIP;
WILLINGBORO TOWNSHIP COUNCIL;
WILLINGBORO TOWNSHIP POLICE DEPT.;
GARY OWENS

Willingboro Township,
Appellant


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 91-cv-04334)


Argued December 8, 1995

BEFORE: STAPLETON, SAROKIN and ROSENN, Circuit Judges

(Opinion Filed July 23, 1996)

                                        Joseph F. Betley
(Argued)
                                        Michael D. Markey
                                        Capehart & Scatchard
                                        8000 Midlantic Drive
                                        Laurel Corporate Center,
Suite 300
                                        Mount Laurel, NJ  08054
                                          Attorneys for
Appellant


                                        Lanier E. Williams
(Argued)
                                        P.O. Box 6584
                                        Philadelphia, PA 19138
                                          and
                                        Christopher Morkides
                                        7115 Sellers Avenue

Upper Darby, PA  19082
Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This case involves a sexual harassment claim by plaintiff Margaret Gares against her former employer Willingboro Township and the Township's former police chief Gary Owens. Following a trial in June of 1993, the jury returned a verdict in favor of Gares against the Township for $20,000 in compensatory damages and $30,000 in punitive damages pursuant to the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. 10:5-1 to -42, and against Owens for $4,000 in compensatory damages and $8,000 in punitive damages pursuant to 42 U.S.C. 1983. Owens did not appeal the judgment. The Township is appealing only the jury's award of punitive damages, arguing that the district court erroneously denied the Township's motion for judgment as a matter of law because: (1) punitive damages are unavailable under the LAD against municipalities, (2) New Jersey law requires evidence of the defendant's ability to pay as a predicate for an award of punitive damages and the plaintiff failed to provide such evidence, and (3) there is insufficient evidence to support a punitive damage award. We will affirm.

I.

In reviewing the denial of the defendants' motion for judgment as a matter of law, we must view the evidence in a light most favorable to the plaintiff. Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992).

Willingboro Township, a New Jersey municipal corporation, is governed by a popularly-elected Town Council, which in turn appoints a Township Manager to handle the day-to-day operations of the Township in the manner of a chief executive officer. The Township Manager is ultimately responsible for all personnel actions, including hirings, promotions, terminations and disciplinary sanctions. Additionally, under the Township's policy on sexual harassment, employees are to direct all sexual harassment claims to the Township Manager, who must then decide what investigative or remedial steps to take.

The next tier of Township officials includes the Chief of Police, who is the head of the Township's Police Department. The Chief of Police, in turn, directly supervises and manages two Captains, one of whom is the Captain of the Services Division. These two Captains supervise the various sergeants and lieutenants within their respective divisions. The Police Department is an integral unit of the Township government, so that all who work in the department are in fact Township

employees.

Margaret Gares began working for the Township's Police Department in about 1974 as a school traffic guard in the Services Division. From at least 1983, upon her promotion to Lieutenant of School Traffic, Gares was under the direct supervision and management of defendant Gary Owens, who served as Captain of the Services Division until his promotion to Chief of Police in October 1990. Continually over that seven-year period, Owens subjected Gares to a sexually hostile work environment by engaging in conduct including: calling Gares sexually offensive names, such as "bimbo," "bimbette," "tramp," "mere woman," "trollop," "dumb blonde," and "Township slut," in the presence of her fellow employees; openly condoning degrading conduct against female employees by other male employees under Owens' direct supervision; permitting the open display of pornographic material in the office; encouraging the public telling of obscene jokes; and touching Gares in an unwelcome and degrading manner, including at one point taunting her by holding her badge up out of her reach and pinning her body against the wall of his office with his own body. Owens persisted in such conduct even after Gares expressly and publicly asked him to stop. Each of the seven other female employees under Owens' direct supervision in the Services Division had made complaints similar to Gares' to then Chief of Police Richard Van Sciver.

A few specific examples of Owens' conduct will provide ample illustration of the nature of his actions. At one point, while Owens was Captain of Gares' division, someone left an obscene photograph on Gares' desk of a nude, extremely large-breasted woman, with Gares' name written across the top of the photograph. When Gares arrived at her desk and discovered the photograph, Owens and several other male officers laughed, much to Gares' anger and embarrassment, and Owens compared Gares' breasts to those depicted in the photograph. A female co-worker testified that Owens had made rude remarks about Gares' breasts on a number of occasions, calling them "bazooka-size" or "elephant-size."

In 1988, on the day after a Township-sponsored seminar on sexual harassment in the workplace (a mandatory seminar that Gares, but not Owens, attended), Gares was working at her desk, which was situated with other desks in a large, main office. A broken garage door into the building was making a lot of noise, and one of a group of several male officers (including Captain Owens) asked what the source of the noise was. Another male officer replied, "Oh, just ignore it, that's [Gares'] dildo." Angry and embarrassed by the officers' and Owens' laughter, Gares immediately stated, as she had been instructed to do in the previous day's seminar, that Owens and the officers were all "on notice" that she found that conduct offensive and wanted it to stop. She then asked Owens, as the officers' supervisor, formally to reprimand the officer who had made the offensive joke. Owens merely walked away, laughing, to his office, but Gares followed him and repeated her demand. Owens then sharply replied, "Just get out of my office, I don't have time for you." (Supp. App. at 8.)

Thus, by his own affirmative conduct, and by tolerating and encouraging similarly offensive conduct on the part of other male employees against Gares and her female co-workers, Captain Owens created and fostered a sexually hostile work environment in the Services Division.

The Police Department operated on a strict "chain-of-command" procedure for employees to register their work-related complaints. Under this system, an employee with a complaint of sexual harassment must first complain to her immediate supervisor. If she is not satisfied with her immediate supervisor's response, the employee must persuade that supervisor to permit an appeal to the next official in the Department's command hierarchy. Should the complaining employee's supervisor choose not to authorize an appeal, the matter would be at an end: a Police Department employee was not permitted to bypass her immediate supervisor to report complaints directly to the Chief of Police or to the Township Manager. Former Chief Van Sciver testified that, if the Chief of Police elects not to tell the Township Manager, the Township Manager would never learn of the complaint. Several witnesses testified that the Police Department had clear, standing orders, reaffirmed periodically, that employees were to obey the chain-of-command rules and were not to see the Township Manager without the permission of the Chief of Police.

The Police Department's chain-of-command policy conflicted squarely with the Township's sexual harassment policy which provides that all employees should direct complaints of sexual harassment to the Township Manager. Gares and several other long-term Police Department employees testified, however, that they were unaware of the Township's sexual harassment policy. Chief Van Sciver was aware of the Township policy and of the Township Manager's personal "open door" policy, but he nonetheless enforced his department's chain-of-command policy because he believed it encouraged employees to work out their problems among themselves.

Gares' immediate supervisor was Owens, the man who was sexually harassing her, and so the Department's chain-of-command procedure trapped her between the Scylla of enduring Owens' offensive conduct and the Charybdis of possible termination for violating the chain-of-command rules by reporting Owens' conduct directly to the Chief of Police or the Township Manager. Gares endured Owens' conduct towards her and his dismissive responses to her complaints for years.

On one occasion in 1987, however, when former Chief Van Sciver happened to observe Gares in tears after Owens had made a sexually offensive remark to her, Van Sciver asked Gares what was the matter. Gares complained of Owens' conduct and explained that Owens had denied her permission to appeal to the Township Manager. Van Sciver told Gares he would take care of the matter, but Owens persisted in his offensive conduct. About a year later, Van Sciver again happened to observe Gares in tears following another of Owens' remarks, and Gares explained that Owens' offensive conduct had not diminished. Van Sciver told Gares that both he and the Township Manager were aware of the

situation. Van Sciver engaged Gares in a third such conversation in 1989, repeating his assurances, yet neither Van Sciver nor the Township Manager ever conducted any investigation or took any remedial action.

After Owens had been promoted to Chief of Police, and shortly after Gares filed her discrimination charges with state and federal agencies in the spring of 1991, Gares met with the Township Manager to discuss Gares' allegations against Owens. The Township Manager told Gares that she did not believe Owens would do such things, and asked if Gares thought Owens "had a thing" for her. (Supp. App. at 60.) Following this meeting, the Township Manager took no steps to investigate the allegations or to correct the situation.

In September 1991, Gares filed this civil rights action in the United States District Court for the District of New Jersey, alleging violations of 1983 and the LAD. In June 1993, the jury returned a verdict in favor of Gares against the Township for $20,000 in compensatory damages and $30,000 in punitive damages pursuant to the LAD, and against Owens for $4,000 in compensatory damages and $8,000 in punitive damages pursuant to 1983. Following the entry of judgment, Gares timely moved for an award of attorney's fees pursuant to the LAD and 1988, and the Township moved pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law as to both the compensatory and punitive damages verdicts. After denying the motion for judgment as a matter of law and granting the award of attorney's fees, the district court entered final judgment. This timely appeal followed.

II.

The district court had jurisdiction over the 1983 claims pursuant to 28 U.S.C. 1331 and 1343, and the court had supplemental jurisdiction over the state law discrimination claims pursuant to 28 U.S.C. 1367. We have jurisdiction pursuant to 28 U.S.C. 1291.

III.
A.

The Township argues first that punitive damages are generally unavailable against municipal corporations and that a court should not construe a statute to allow such damages absent clear legislative expression or intent. Gares counters that the LAD does, by its express terms, its legislative history and the relevant case law, clearly provide for punitive damages against all employers, including municipalities.

In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us. Kowalsky v. Long Beach Twp., 72 F.3d 385, 388 (3d Cir. 1995); McKenna v. Pacific Rail Serv., 32 F.3d 820, 825 (3d Cir. 1994). In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in

predicting how the state's highest court would rule.  McKenna, 32 F.3d at 825; Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991) (in predicting state law, we cannot disregard the decision of an intermediate appellate court unless we are convinced that the state's highest court would decide otherwise).  Our review of the district court's determination of state law is de novo.  Kowalsky, 72 F.3d at 388.

Although the New Jersey Supreme Court and a panel of the superior court have, as explained below, spoken to the issue at hand, their decisions are not controlling law: the supreme court decision was evenly split 3–3, and, in New Jersey, a panel of the Superior Court, Appellate Division, is not bound by a prior decision of another panel of that court.  E.g., Manturi v. V.J.V., Inc., 431 A.2d 859, 862 (N.J. Super. Ct. App. Div. 1981) ("A decision of an inferior court is not binding on a court of coordinate jurisdiction.").  These decisions nevertheless remain important guides for, in determining how the New Jersey courts would approach and solve our problem, we must consider "analogous decisions, considered dicta, . . . and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  McGowan v. University of Scranton, 759 F.2d 287, 291 (3d Cir. 1985) (internal quotation marks omitted).

We begin with the plain language of the statute.  Under the LAD, it is unlawful for an "employer" to discriminate against an employee on the basis of her sex.  N.J. Stat. Ann.  10:5-13.  The statute expressly defines the term "employer" to include "the State, any political or civil subdivision thereof, and all public officers, agencies, boards or bodies."  N.J. Stat. Ann.  10:5-5(e).  The LAD was amended in 1990 specifically to clarify that it makes available jury trials and legal remedies, including punitive damages:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. . . .  Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages.  The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

N.J. Stat. Ann.  10:5-3 (emphasis added).  The statute reiterates: "All remedies available in common law tort actions shall be available to prevailing plaintiffs.  These remedies are in addition to any provided by this act or any other statute."  N.J. Stat. Ann.  10:5-13.

As Gares points out, the plain language of the statute indicates the legislature's intent to make punitive damages available under the LAD to all plaintiffs, including those with public employers.  Gares also refers us to the legislative history of the 1990 amendments, which were enacted to overrule a

1989 decision of the New Jersey Supreme Court by expressly providing that jury trials and punitive damages are available under both the LAD and the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann.   34:19-1 to -8 (also known as the "Whistleblower Act").  That legislative history states that "the LAD is to be liberally construed so that all common law remedies, including compensatory and punitive damages, are available to persons protected by the LAD."  Assembly Judiciary, Law and Public Safety Committee, Statement to Assembly Committee Substitute for Assembly Nos. 2872, 2118 and 2228 (Feb. 8, 1990), reprinted in N.J. Stat. Ann.   10:5-3 at 454 (West 1993) and in1990 N.J. Sess. Law Serv. 70, 73 (West).  Thus, the legislative history reinforces the plain, broad and inclusive language of the statute and nowhere indicates any intention to exempt public entities from possible punitive damages awards.

A review of New Jersey case law provides no reason to imply an exception for public employers into the LAD's express punitive damage provisions, but instead reinforces the plain meaning of the statute.  In Abbamont v. Piscataway Twp. Bd. of Educ., 650 A.2d 958 (N.J. 1994), the New Jersey Supreme Court, in a 3-3 decision on the issue, let stand a superior court holding that punitive damages are available against public entities under CEPA--a statute the state supreme court has noted is analogous in relevant language, purpose, and legislative history to the LAD. See Abbamont, 650 A.2d at 971; N.J. Stat. Ann.   34:19-5 (West Supp. 1995) (CEPA language, analogous to LAD language, providing: "All remedies available in common law tort actions shall be available to prevailing plaintiffs.  These remedies are in addition to any legal or equitable relief provided by this act or any other statute.  The court may also order . . . [p]unitive damages . . . .").  Although the decisions of the supreme court plurality and the superior court in Abbamont are not controlling state law, we believe the majority and dissenting opinions in that case best demonstrate how the New Jersey courts would approach the issue before us and, accordingly, those opinions provide the best guidance in predicting how the supreme court would decide our issue today.

The plaintiff in Abbamont was a non-tenured industrial arts teacher who sued the board of education under CEPA, alleging that he was not rehired in retaliation for his complaints about inadequate ventilation in his shop.  The jury returned a verdict for the teacher, but the trial court withheld the punitive damages issue from the jury.  The superior court on appeal reversed and remanded for a jury trial on the issue of punitive damages, holding that punitive damages are available under CEPA against public entities.  Abbamont v. Piscataway Twp. Bd. of Educ., 634 A.2d 538, 548 (N.J. Super. Ct. App. Div. 1993), aff'd, 650 A.2d 958 (N.J. 1994).  An evenly-divided New Jersey Supreme Court affirmed.

The plurality's analysis in Abbamont began with observations analogous to those above about the plain language of the statute.  Like the LAD, CEPA proscribes certain conduct by employers (specifically, retaliatory action against employees for disclosing the employer's unlawful practices or policies), and

the statute defines "employer" to include, inter alia, "all branches of State Government, or the several counties and municipalities thereof . . . ." N.J. Stat. Ann. 34:19-2(a). CEPA explicitly provides that an aggrieved employee may seek relief including punitive damages. N.J. Stat. Ann. 34:19-5(f). The Abbamont plurality, like the superior court majority, found this plain language of the statute compelling, and observed that "no specific CEPA provision exists that precludes the awarding of punitive damages against public employers. That omission must be deemed purposeful." 650 A.2d at 968.

The Abbamont dissenters, while conceding that CEPA can be broadly read to permit a punitive damages award against a public employer, observed that CEPA does not explicitly state that punitive damages may be awarded against public employers. The dissent then expressed doubt that, by enacting CEPA, the state legislature intended to "overcom[e]" New Jersey's Tort Claims Act ("TCA") insofar as the TCA provides that "[n]o punitive or exemplary damages shall be awarded against a public entity." N.J. Stat. Ann. 59:9-2c. "The problem," the dissent stated, "is in reconciling the language of [the TCA] with that [of CEPA]." 650 A.2d at 973 (Pollock, J., dissenting in part). The dissent, also mentioning several public policy reasons why such punitive damages awards should not be available, concluded that "not permitting punitive-damage awards against public employers is more consistent with the legislative intent," and that "[t]he best solution would be for the Legislature to revisit the issue and resolve it definitively." Id.

The principal issue that divided the supreme court in Abbamont, then, was whether the LAD could be reconciled with the TCA. The plurality rejected the "implied repealer" argument because "[t]he presumption against an implied repealer is grounded in the basic statutory construction rule 'that every effort should be made to harmonize the law relating to the same subject matter'" and the "TCA and CEPA involve different subject matter." Abbamont, 650 A.2d at 970 (quoting State v. Green, 303 A.2d 312 (N.J. 1973)) (emphasis in original). In discussing this point, the plurality drew from precedent regarding the LAD, relying on the strong parallels between CEPA and the LAD. Citing Fuchilla v. Layman, 537 A.2d 652 (N.J.), cert. denied, 488 U.S. 826 (1988), the Abbamont plurality noted that the LAD's purpose is to abolish discrimination in the workplace, a goal that serves both public and private interests, whereas the TCA's purpose is to provide compensation to tort victims without imposing excessive financial burdens on the taxpaying public. Abbamont, 650 A.2d at 970. The LAD provides relief from conduct more akin to the malicious or willful acts exempted from the TCA than the negligently inflicted injuries covered thereby. "Moreover, '[the Tort Claims] Act disavows any remedial purpose to vindicate societal interests or to rectify public or governmental misconduct or to protect any individual constitutional or civil right. It thus expressly prohibits exemplary or punitive damages under the Act.'" Abbamont, 650 A.2d at 970 (quoting Fuchilla, 537 A.2d at 665 (Handler, J., concurring)) (alteration in original). The LAD, by contrast, is a civil rights statute that

embraces the remedial purpose disavowed by the TCA, and as such "should be construed liberally to effectuate its important social goal." Id. at 971; see also N.J. Stat. Ann. 10:5-3 ("The Legislature intends that . . . this act shall be liberally construed . . . .").

The Abbamont plurality also recognized that punitive damages are available under the LAD only where the offending conduct "is particularly egregious," 650 A.2d at 970, which the supreme court has defined, as explained more fully below, as conduct that is intentional, malicious, and "evil-minded." Rendine v. Pantzer, 661 A.2d 1202, 1215 (N.J. 1995). The TCA, in contrast, explicitly provides that a public entity is not liable thereunder "for the acts or omissions of a public employee constituting . . . actual malice[] or willful misconduct." N.J. Stat. Ann. 59:2-10. Thus, the TCA does not apply to intentional wrongs such as give rise to claims under the LAD, so that the TCA's "limitation[] on judgments" proscribing punitive damages awards for tort claims brought thereunder, id. 59:9-2(c), is simply inapplicable to the LAD. The two statutes operate independently of one another. As the New Jersey Supreme Court concluded in Fuchilla, because of the differences in purpose and scope of the two statutes, "the Legislature did not intend that the [Tort Claims] Act apply to discrimination claims under the [LAD]." 537 A.2d at 660.

We accordingly predict that the New Jersey Supreme Court would follow its decision in Fuchilla and the plurality opinion in Abbamont to hold that the TCA's exclusion of punitive damages awards against public entities is not controlling in light of the LAD's plain language and stated purpose. Because the supreme court has held that the TCA does not apply to claims under the LAD alleging intentional or malicious misconduct of a public employee, there is no conflict between the two statutes, and accordingly no implied repealer under New Jersey law.

Not only did the supreme court plurality in Abbamontfind the TCA no barrier to punitive damage recoveries against municipalities in CEPA actions, it also found that the TCA "exemplifies the Legislature's ability to exclude the availability of punitive damages against public entities when it so chooses. See also N.J.S.A. 59:13-3 (providing 'no recovery against the State for punitive . . . damages arising out of contract' allowed under the Contractual Liability Act)." 650 A.2d at 969 (omission in original). But the state legislature did not exclude such recovery under either the LAD or CEPA, and the plurality was unwilling to attribute this result to legislative inadvertence or oversight: "That omission must be deemed purposeful," for the TCA "reestablished sovereign immunity against tort claims 'except whe[n] there is a statutory declaration of liability.'" Id. (quoting Burke v. Deiner, 479 A.2d 393, 397 (N.J. 1984)).

Finally, the plurality, like the superior court majority, found that the New Jersey legislature must have considered and rejected policy arguments such as those articulated a decade earlier in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981) (holding that punitive damages are not

available against municipalities under 42 U.S.C. 1983), when it amended the LAD and CEPA in 1990 to make punitive damages available to "all persons" protected under the two statutes. Abbamont, 650 A.2d at 969-70; 634 A.2d at 547. The Abbamont plurality also stated that those policy concerns are partly alleviated by the heightened standard for imposing liability for punitive damages under the LAD as articulated in Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 464 (N.J. 1993) (expressly rejecting a theory of vicarious liability and holding that punitive damages are available under the LAD only if the conduct of managerial or supervisory officials is particularly egregious and involves willful indifference or actual participation). "Based on that kind of misuse of governmental authority," the Abbamont plurality observed, "punitive damages serve to effectuate the goals of a statute that is specifically designed to discourage and eradicate vindictive action by employers and to further important interests of both employees and the public." 650 A.2d at 970; see also Lehmann, 626 A.2d at 465 ("We think that providing employers with the incentive not only to provide voluntary compliance programs but also to insist on the effective enforcement of their programs will do much to ensure that hostile work environment discrimination claims disappear from the workplace and the courts."). The Abbamont plurality thus "defer[red] to the Legislature in including punitive damages in the remedial arsenal available against public as well as private employers for especially virulent retaliatory conduct." 650 A.2d at 970.

We find the analysis of the Abbamont plurality persuasive. We agree with its ultimate conclusion: "A sensible and unconstrained reading of the language of CEPA, a consideration of the provisions of CEPA in light of the Tort Claims Act (TCA), a review of CEPA's legislative history, an understanding of the underlying policy concerns in awarding punitive damages against public entities, and an examination of CEPA's remedial purpose persuade us that CEPA does allow the award of punitive damages against public entities." Id. at 968 (citation omitted).

Moreover, we conclude that the analysis of the Abbamont plurality regarding the CEPA is equally persuasive in the context of the LAD. The LAD and CEPA are quite similar in their broad language, remedial purpose, and legislative history (having both been amended by the same act to include jury trials and punitive damages). The New Jersey Supreme Court treated them as matching pairs in Abbamont, construing the LAD and CEPA together as distinct from the TCA. Abbamont could as easily have been a decision under the LAD; the same arguments apply equally to both statutes.

Given the plain language, legislative history and purpose of the LAD, and considering the New Jersey courts' interpretations of the LAD and CEPA, we predict that the Supreme Court of New Jersey would hold that the LAD permits the recovery of punitive damages against public entities.

B.

The Township next argues that the punitive damages

award must be set aside because the plaintiff produced no evidence of the defendant's financial condition or ability to pay. Gares counters that there was sufficient evidence before the jury from which it could have inferred that the Township had the ability to pay the $30,000 punitive damages award it assessed. She also points to the district court's assertion that it would be "an absolute waste of judicial time and resources" to conduct a second trial on the punitive damages issue, solely to add evidence of the Township's ability to pay, where the offending conduct was so egregious and the punitive damages award was only $30,000. (Dist. Ct. Op. of June 16, 1994 at 9.) As explained above, we exercise plenary review over the district court's determination of state law.

Under the general law of punitive damages in New Jersey, the plaintiff has the burden of producing evidence of the defendant's ability to pay a punitive damages award. Herman v. Sunshine Chemical Specialties, Inc., 627 A.2d 1081, 1090 (N.J. 1993) (stating that the plaintiff bears the burden of proving a defendant's financial condition in "all claims for punitive damages"); McDonough v. Jorda, 519 A.2d 874, 879 (N.J. Super. Ct. App. Div. 1986) (holding that, "[i]n assessing exemplary damages, a jury must take into consideration the wealth of the defendants"--"an essential of [the plaintiff's] burden of proof," the absence of which "precluded the jury from having a proper foundation to assess damages"), certif. denied, 540 A.2d 1282 (N.J. 1988), cert. denied, 489 U.S. 1065 (1989).

In Herman, the New Jersey Supreme Court was called upon to interpret a New Jersey Products Liability Act provision regarding punitive damages. Although the statute, in accordance with New Jersey common law, expressly provided that the trier of fact "shall consider . . . [t]he financial condition of the tortfeasor," the statute did not expressly allocate the burden of proof on that issue. 627 A.2d at 1087-88 (quoting N.J. Stat. Ann 2A:58C-5d(4)). As the supreme court noted, however, the statute does explicitly state that "[e]xcept as otherwise expressly provided in this act, no provision of this act is intended to establish any rule, or alter any existing rule, with respect to the burden of proof . . . ." Id. at 1088 (quoting N.J. Stat. Ann. 2A:58C-7). "Just one year before the adoption of the act," noted the court, "the Appellate Division made clear that the burden of proof rests on the plaintiff." Id. (citing McDonough, 519 A.2d at 879). Because the statute did not change that allocation, the supreme court concluded that the plaintiff bears the burden of proof of the defendant's ability to pay under the Products Liability Act. Id.

We believe the New Jersey Supreme Court would similarly conclude that this rule applies to punitive damages awards under the LAD. The LAD is silent as to the requisite proof or instructions regarding punitive damages awards. As explained above, the state legislature amended the LAD in 1990 to provide for "legal remedies, including compensatory and punitive damages," such as existed at "common law." N.J. Stat. Ann. 10:5-3. The state legislature thus made available punitive damages awards under the LAD with conscious reference to the

existing common law of punitive damages awards. See also id. 10:5-13 ("All remedies available in common law tort actions shall be available to prevailing plaintiffs."). At the time the LAD was enacted, New Jersey common law provided that the plaintiff bears the burden of proof of the defendant's financial condition to support an award of punitive damages. See Herman, 627 A.2d at 1088 (citing 1986 superior court decision in McDonough). We believe the New Jersey Supreme Court would accordingly interpret the LAD to hold that the general law of New Jersey regarding evidence of a defendant's ability to pay applies to LAD actions involving punitive damages.

The plaintiff's failure to produce evidence of the defendant's ability to pay does not necessarily require the court to set aside a jury's award of punitive damages, however. SeeHerman, 627 A.2d at 1090 (holding that, although the plaintiff failed to produce the requisite evidence of the defendant's financial condition, the jury ultimately heard sufficient evidence thereof to support the punitive damages award). The supreme court in Herman noted that a defense witness testified on cross-examination that, during a year relevant to the litigation, the company had had gross sales of $3.5 million and its owner had sold 100% of its stock for $750,000. 627 A.2d at 1090. The court found that this circumstantial evidence of ability to pay, "although not overwhelming, [was] sufficient to support an award of punitive damages" of $400,000 where the defendant did not argue that the award was excessive. Id.

New Jersey requires juries to take into account evidence of the defendant's financial condition "because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person." McDonough, 519 A.2d at 879 (citing Restatement (Second) of Torts  908 cmt. d (1977)); accord Herman, 627 A.2d at 1089 (noting that the purposes of punitive damages are punishment and deterrence). The New Jersey Supreme Court noted in Herman that the evidence of "ability to pay" does not necessarily equate with "net worth" because, "[d]epending on the facts of a case, a defendant's income might be a better indicator of the ability to pay." 627 A.2d at 1089.

The relevance of such evidence therefore goes solely to the amount of an appropriate damage award. It is relevant to the amount of such an award for two reasons. The amount should be large enough in relation to the defendant's ability to pay so that the sanction is felt, i.e., is effective. On the other hand, the amount should be small enough in relation to the defendant's ability to pay that it is not over-the-hill, i.e., beyond the defendant's ability to pay without unduly harsh consequences. See generally Herman, 627 A.2d at 1086-87 (discussing arguments for and against having juries consider evidence of a defendant's wealth).

If the record in a case provides some basis for a conclusion that the verdict is not beyond the defendant's ability to pay, we do not believe a defendant would be heard to complain in New Jersey about the possibility of the award being too low.

We think this is such a case. While the current record regarding the Township's ability to pay might not support a very large punitive damage verdict, we believe the jury could, as the district court found that it did, infer from background evidence bearing circumstantially on the ability to pay issue that the Township could fairly be called upon to pay a punitive damage award of $30,000. Trial testimony indicated that the Township employed over 100 police officers and traffic guards (plus an unspecified number of supervisors, secretaries and support staff) in its police department alone, allowing the jury reasonably to infer that, if the Township could pay normal wages to hundreds of employees, it had the ability to pay $30,000 to one wronged employee. "[A]lthough not overwhelming," this evidence is sufficient to support the relatively small punitive damages award under the facts of this case. See Herman, 627 A.2d at 1090. Like the defendant in Herman, the Township does not argue that the award is excessive. On this basis, we predict that the supreme court would find the award supported on the facts of this case. Accordingly, we conclude that the district court did not err in refusing to set aside the jury's award of punitive damages against the Township.

C.

Arguing that there is no evidence of exceptional circumstances necessary to support a punitive damages award under the LAD, the Township's final contention is that the district court erred in refusing to set aside the punitive damages award against the Township for insufficient evidence. In resolving this issue, we must review the district court's denial of the Township's motion for judgment as a matter of law. We apply the same federal standard the district court should have applied: viewing the evidence in a light most favorable to the plaintiff, a motion for judgment as a matter of law should be denied unless the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief. Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992).

In the context of CEPA but drawing from precedent under the LAD, a plurality of the New Jersey Supreme Court has stated that punitive damages are available against public entities

> if the conduct of managerial or supervisory
> government officials is particularly
> egregious and involves willful indifference
> or actual participation. Based on that kind
> of misuse of governmental authority, punitive
> damages serve to effectuate the goals of a
> statute that is specifically designed to
> discourage and eradicate vindictive [or,
> under the LAD, discriminatory] action by
> employers and to further important interests
> of both employees and the public.

Abbamont, 650 A.2d at 970 (discussing standards articulated in Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 464 (N.J. 1993) (regarding the LAD)).

The supreme court's most recent articulation of the

standard for awarding punitive damages against an employer under the LAD is this: the plaintiff must establish (1) that the offending conduct was "especially egregious" and (2) that upper management actually participated in or was willfully indifferent towards that conduct.  Rendine v. Pantzer, 661 A.2d 1202, 1215 (N.J. 1995) (citing Lehmann, 626 A.2d at 464).  The court stated that, for the offending conduct to be "sufficiently egregious to warrant a punitive-damage award," the conduct must be "wantonly reckless or malicious," or,

> an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another. . . .  Our cases indicate that the requirement [of willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences.

Id. (internal quotation marks omitted; alteration in original).  The employer in Rendine surreptitiously replaced the plaintiff employee while she was on maternity leave and then contrived pretextual reasons upon her return to fire her.  The court held that the evidence was sufficient to "permit[] the jury to conclude that defendant's decision to terminate plaintiff's employment was accompanied by conduct that was malicious and intentionally wrongful."  Id. at 1216.

Applying this standard here, we must first address whether there is sufficient evidence from which the jury might reasonably have found that Owens' conduct was "especially egregious."  We believe that there is ample evidence to support such a conclusion.  Owens' actions are the sort of "deliberate act[s] or omission[s] with knowledge of a high degree of probability of harm and reckless indifference to consequences" that warrant a punitive damages award under the LAD.  Id. at 1215 (internal quotation marks omitted).  In short, because there is sufficient evidence that Captain Owens fostered a sexually hostile work environment within the Services Division, and that he persisted for years in his highly offensive conduct despite his knowledge that it offended and upset Gares, the jury could reasonably have found that Owens' conduct was "especially egregious."

The second prong of the punitive damages standard requires us to consider whether there is sufficient evidence that upper management actually participated in or was callously indifferent towards the offensive conduct.  We believe the jury might reasonably have found that Owens' position qualified him as "upper management" himself.  For the first seven years of Owens' harassment of Gares (from 1983 to 1990), Owens was the Captain in charge of the Services Division wherein plaintiff Gares worked, answerable only to the Chief of Police and the Township Manager above him.  As Captain of the Services Division, Owens set the atmosphere and controlled the day-to-day operations of that office.  Because of his high rank and pervasive influence over

the employees he supervised, the jury was entitled to find that Captain Owens was an upper management official whose outrageous conduct subjected the Township to punitive damages liability under the LAD.

Although Owens may be the only supervisory official who actually participated in the offensive conduct, the jury's award can also be justified because there is evidence that other "upper management" officials showed callous disregard for Owens' conduct. The record would support a finding that Chief Van Sciver, and perhaps even the Township Manager herself, were aware of but willfully indifferent to Gares' complaints. On several occasions between 1987 and 1989 when Gares complained to Chief Van Sciver about Owens' offensive conduct, Van Sciver would promise to "take care of" the situation and would say he had told the Township Manager about Gares' complaints, but neither he nor the Township Manager did anything to investigate or remedy the situation over the next few years. The Township agreed with the district court that Chief Van Sciver's statement's are attributable to the Township itself (Supp. App. at 3-4)--which is especially appropriate in light of the Police Department's chain-of-command policy that prohibited Gares from appealing directly to the Township Manager. When the Township Manager read Gares' administrative complaint, she told Gares she "didn't believe Owens would ever say such things" and asked Gares if she thought Owens "had a thing" for Gares. Given the outrageousness of Captain Owens' conduct towards the women in his division and towards Gares in particular, and given the seven-year period over which all this conduct took place on a daily or weekly basis, the jury could reasonably have concluded that Chief Van Sciver and the Township Manager were aware of but callously and deliberately indifferent towards Owens' egregious conduct.

Thus, we hold that there was sufficient evidence to support the jury's award of punitive damages against the Township, and that the district court accordingly did not err in declining to set that award aside.

IV.

For the foregoing reasons, we will affirm the district court's order denying the Township's motion for judgment as a matter of law.

GARES v. WILLINGBORO TOWNSHIP, et al.
No. 95-5269
ROSENN, Circuit Judge, dissenting.

The immunity at common law of municipal corporations from liability for punitive damages was generally understood when the federal Civil Rights Act became law in 1871. Courts that had considered the issue prior to the enactment of section 1983 "were virtually unanimous in denying such damages against a municipal corporation." City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 259 (1981). Judicial aversion against awarding punitive damages against a municipality persists in the overwhelming majority of jurisdictions even now. "The general rule today is

that no punitive damages are awarded unless expressly authorized by statute."  Id.; 18 McQuillin, Municipal Corps.  53.18.10, p.247 (3rd Ed. 1993).

The New Jersey Law Against Discrimination (LAD), N.J.S.A.  10:5-1 et seq., does not expressly make a municipality liable for punitive damages.  Moreover, strong public policy and logic militate against the assessment of such exemplary damages.  Because of these reasons, I believe the New Jersey Supreme Court would hold that municipalities in the State of New Jersey are immune from punitive damages in suits brought against them under the LAD.  I therefore respectfully dissent.

I.

Gares, a Township employee, suffered discrimination and harassment because of her sex.  This is a violation of her civil rights under federal and New Jersey law, and the jury appropriately compensated her for the actual damages she suffered.  The jury also found that the offender, former police chief Gary Owens, behaved egregiously, and assessed punitive damages against him to punish or to teach him a lesson.  But that, in my view, is the limit of the damages which plaintiff can recover for her injuries.

The District Court permitted the jury to assess punitive damages against the township of Willingboro as well, under New Jersey's LAD.  Because this raises a question pertaining to the correct statutory interpretation, it is a purely legal issue.  Thus, this court should exercise plenary review, giving no deference to the district court's holding.  Oritani Sav. and Loan Ass'n v. Fidelity and Deposit Co. of Maryland, 989 F.2d 635 (3d Cir. 1993).

The majority relies on a 3-3 decision addressing the question of the availability of punitive damages against a municipality in New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A.  34:19-1 et seq., a substantially similar statute designed to protect "whistleblowers" from retaliatory action by their employers.  In Abbamont v. Piscataway Township Board of Education, 634 A.2d 538 (N.J.Super. 1993), the Superior Court of New Jersey, in a 2-1 decision, held that the issue of punitive damages against the Township for violations of CEPA, under a theory of vicarious liability, should be submitted to the jury.  The majority reasoned that, because public employers were not specifically exempted from this portion of the statute, they were impliedly included.

The Supreme Court of New Jersey, however, split on this issue, 3 to 3.  In Abbamont v. Piscataway Township Board of Education, 650 A.2d 958 (N.J. 1994), the opinion written by Judge Handler adopted the reasoning of the panel majority of the Superior Court.  Judge Pollock, however, joined by two other judges, held that "the Legislature did not intend that public entities should be subject to payment of punitive damages under the Conscientious Employee Protection Act."  Abbamont, 650 A.2d at 972-73 (Pollock, J., dissenting).  Accordingly we have no clear mandate from the New Jersey Supreme Court on this issue.  Although the majority in this case recognizes that we have no controlling law, typescript at 10, it fully adopts the reasoning

of the Handler opinion.  I believe that this reasoning ignores important considerations of history, policy and United States Supreme Court precedent which today would decisively influence a majority of the New Jersey Supreme Court to the contrary.

LAD itself is silent upon this issue.  It specifically includes the State and its political subdivisions in its definition of employer, N.J.S.A.  10:5-5(e), and provides that "[a]ll remedies available in common-law tort actions shall be available to prevailing plaintiffs."  N.J.S.A.  10:5-13.  Based on a tortured reading of these two provisions, Gares asserts that the statute provides for the imposition of punitive damages against a municipality.  The majority agrees, relying heavily on a phrase within the LAD that provides that the Act "shall be liberally construed."  N.J.S.A.  10:5-3.  This phrase is insufficient to constitute express authorization of punitive damages against municipalities in light of history and overwhelming case law; express authorization is what is needed to make them available to plaintiffs.

Municipalities were absolutely immune from suit at common law.  The New Jersey legislature may have abrogated this immunity for purposes of the LAD, but there is no evidence in the plain language of the Act or in the legislative history to show that the legislature intended to abrogate immunity so far as to make municipalities liable for punitive damages over and above compensation to the injured employee.  The majority relies on implication to reach this conclusion, an implication which I cannot believe the legislature intended.

At common law, it was well-settled that municipalities could not be subject to punitive damages.  The United States Supreme Court and the majority of states that have considered this issue have kept this common-law rule.  See, e.g., Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)(recognizing the common law, and extending it to exempt municipalities from punitive damages under 42 U.S.C.  1983); Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir. 1991)(holding that civil RICO claim, because of the punitive nature of its damages, could not be brought against a municipality); Fisher v. Miami, 160 So.2d 57 (Fla.App. 1964)(ruling that punitive damages against a municipality do not serve the purpose of punitive damages against private bodies, and unfairly punish the public).

In fact, originally municipalities were not liable even for compensatory damages.  Rather, municipalities, as agents solely of the public, were absolutely immune from suit.  See, Russell v. Men of Devon, 100 Eng.Rep. 359 (1789).  Since that time, absolute immunity for municipalities has been abrogated.  Judges have held that losses due to tortious conduct on the part of municipal employees is better borne by the municipality than by the wholly innocent injured individual.  This makes sense, as it would be unjust for a plaintiff to go completely uncompensated after suffering compensable injuries.  Compensatory damages, then, have become part of the cost of the administration of government.

Such concerns, however, are not present in the realm of punitive damages.  Punitive damages are completely unrelated to

compensating and "making whole" the injured plaintiff. Rather, they are monies awarded solely to punish the defendant, whose conduct has been deemed egregious, and to discourage him or her from continuing the pattern of behavior. Punitive damages, when assessed against individuals, as they are here against Owens, benefit the public by discouraging such behavior. See, Newport, 453 U.S. at 261.

This rationale, however, is inapplicable to a municipality. Punitive damages, when assessed against a municipality, are ultimately borne by the taxpayers, who have no control or input in the officer's offensive behavior. Thus, the damages punish those persons who normally benefit by their assessment. Punishing innocent taxpayers serves no purpose but to give a windfall to the plaintiff. For this reason, the majority of states that have considered the issue have not assessed punitive damages against municipalities.

> In general, courts viewed punitive damages as contrary to sound public policy because such awards would burden the very taxpayers and citizens for whose benefit the wrongdoer was being chastised. The courts readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vindictive damages appropriate as punishment for the bad-faith conduct of those same officers and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment and the municipalities from undue fiscal constraints.

Newport, 453 U.S. at 261.

When punitive damages are assessed against a private corporation, such costs are ultimately borne by the shareholders. However, shareholders in private corporations can demand accountings, and can divest themselves of their shares if they disapprove of the corporation's conduct. In contrast, citizens of a municipal corporation have no way of demanding an accounting, and no way of disassociating except to move to another jurisdiction, an option that, depending on financial ability, the housing market, availability of suitable neighborhoods, and such, is dubious at best.

Citizens do have the power to vote for some of their municipal officers. However, this power can be exercised only periodically, and even then, citizens cannot make every personnel decision. In the present case, for example, Sadie Johnson, the Township manager, who was appointed to her position, appointed former chief Owens to his position. It is difficult to see what the citizens of Willingboro could have done in the situation before us. "While theoretically [municipal residents] have a voice in selecting the agents who shall represent and control the municipality, we know that practically it often happens that the government is not of their choice, and its management not in accordance with their judgment." Genty, 937 F.2d at 910, citingRanells v. City of Cleveland, 321 N.E.2d 885, 88-89 (Ohio 1975).

Moreover, the reasoning that punitive damages serve as a deterrent becomes less sensible when applied to a municipality. As the Court stated, "it is far from clear that municipal officials...would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality." Newport, 453 U.S. at 268. Indeed, the individual officials are much more likely to be deterred by the threat of punitive damages assessed specifically against them.

I do not mean to imply by this dissent, that states may not ignore these policies and choose to subject their municipalities to punitive damages. However, the state legislature must make such a choice explicitly in order to be enforceable. In Newport v. Fact Concerts, Inc., supra, the Court refused to impose punitive damages on municipalities under 42 U.S.C. 1983. A substantial portion of its reasoning was that the Court found "no evidence that Congress intended to disturb the settled common-law immunity." Id., at 265. Thus, we too should find positive evidence in LAD that the New Jersey legislature intended to include municipalities as defendants subject to punitive damages. The absence of an intent to exclude them is insufficient to predicate the prediction announced by the majority in this appeal.

I also doubt that the Legislature, when enacting LAD, "thought that it was overcoming the ban of the Tort Claims Act (TCA), N.J.S.A. 59:9-2, on awarding punitive damages against public entities. That statute provides: `No punitive or exemplary damages shall be awarded against a public entity.' Id." Abbamont v. Piscataway Township, 650 A.2d 958, 972 (N.J. 1994)(Pollock, J., concurring and dissenting).

                                II.

In sum, the better policy, and the weight of the law, is against permitting courts to assess punitive damages against a municipality, especially at this time when states, including New Jersey, the local municipalities, and even the national government have troublesome budgetary problems. Although municipalities are liable for the actual damages suffered by plaintiffs, and the personal offender for both actual and punitive damages, the overwhelming majority of jurisdictions have held that municipal liability is limited to compensatory damages. See 18 McQuillin on Municipal Corp. 53.18.10 (3d Ed. 1993).

New Jersey is certainly free to set contrary policy in its municipalities. However, such policy should be expressly stated by legislative enactment, not judicial decision. There is no express intent in the LAD to subject municipalities to punitive damages. Rather, the statute awards plaintiffs all the benefits they would receive at common law. At common law, a plaintiff could have recovered nothing from a municipality. The New Jersey legislature has expressly broadened the definition of employer to include municipalities, thus broadening a plaintiff's common law remedies. But without express authorization in the statute for also assessing punitive damages against municipalities, I am unwilling to agree with the majority that the New Jersey Supreme Court would agree that this was the legislature's intent. Such a break with precedent would have to

be precisely spelled out.  Therefore, I must dissent.